DYKEMA GOSSETT LLP
Ashley R. Fickel (Bar No. 237111)
333 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: (213) 457-1800
Facsimile: (213) 457-1850
Email: afickel@dykema.com

DYKEMA GOSSETT PLLC
Thomas J. Judge (*Pro Hac Vice Pending*)
Jeffrey J. Ward (*Pro Hac Vice Pending*)
1301 K Street, NW, Suite 1100 West
Washington, D.C. 20005
Telephone: (202) 906-8600
Facsimile: (888) 886-6915
Email: tjudge@dykema.com
jward@dykema.com

Attorneys for Plaintiff
XL SPECIALTY INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| XL SPECIALTY INSURANCE COMPANY,<br><br>            Plaintiff,<br><br>      vs.<br><br>AIG SPECIALTY INSURANCE COMPANY,<br><br>            Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff XL Specialty Insurance Company ("XL"), by undersigned counsel, hereby asserts this Complaint against defendant AIG Specialty Insurance Company ("AIG"), alleging as follows:

**INTRODUCTION**

1. In this insurance coverage action, XL seeks to recover $1 million from AIG that XL paid to protect their mutual insureds from claims made against them in underlying lawsuits that AIG was responsible for and wrongfully refused to pay without any justification or explanation.

2. XL issued an excess policy to a private equity company, Levine Leichtman Capital Partners, Inc. ("LLCP"). AIG issued a directors' and officers' policy to PWC Holding Corporation ("PWC Holding"), which provides coverage for the directors and officers of an LLCP portfolio company, Pacific World Corporation ("Pacific World").

3. The AIG policy indisputably provides primary coverage to Pacific World's directors, some of whom are also executives of LLCP. Because Pacific World refused to advance the directors' defense costs for the underlying lawsuits, which included a lawsuit that Pacific World itself brought against them, the AIG policy's "Side A" D&O coverage was triggered.

4. While AIG has proceed as though its policy has only a $10 million limit of liability, the policy actually includes a supplemental $1 million limit applicable to Side A claims, which it has refused to pay towards its insured directors' defense costs and settlement of the underlying lawsuits. To protect those insureds, XL paid over $3.1 million for their defense costs and the settlement of the underlying lawsuits, and now seeks repayment of the $1 million AIG owes but has refused to pay.

5. Following a January 2020 mediation that resulted in the settlement of the underlying lawsuits, AIG refused to justify or explain its refusal to contribute its $1 million Side A limit towards payment of defense costs and funding of the settlement. Only after XL provided AIG with a draft complaint in May 2020, did

AIG, for the first time, raise purported coverage defenses in an attempt to escape its additional $1 million obligation.

6. None of AIG's purported coverage defenses have merit. First, AIG's assertion that the loss did not trigger its policy's the Side A coverage is plainly wrong. Pacific World refused to indemnify the director defendants, triggering AIG's Side A coverage pursuant to the AIG policy's express terms. Second, AIG's contention that the director defendants were not sued in an insured capacity is definitively refuted by the allegations and causes of action in underlying complaints. Third, AIG's newly crafted position that it is entitled to a better allocation of loss as between the director defendants and LLCP than what it agreed to with respect to defense costs has no merit. That argument, as an initial matter, ignores that AIG specifically agreed to allocate 55% of jointly incurred defense costs to the director defendants and the AIG policy. Pursuant to that agreement, AIG owes $478,586.73 under its Side A limit for such defense costs. AIG owes the remainder of the $1 million Side A limit to fund the settlement of the underlying lawsuits. Indeed, the AIG policy has no allocation clause. Under California's "larger settlement rule" and "reasonably related test," AIG is actually responsible for 100% of the underlying lawsuits' defense costs and settlement until it exhausts its $1 million Side A limit.

7. After a delay of several months, and only after being confronted with this litigation, did AIG even attempt to offer a purported explanation for its failure to pay its $1 million Side A limit. To date, AIG has not provided—because it cannot—any rational, let alone legally valid, basis for its continued withholding of its $1 million Side A limit.

## PARTIES

8. XL Specialty Insurance Company is a Delaware corporation with its principal place of business in Stamford, Connecticut.

9. AIG Specialty Insurance Company is an Illinois corporation with its principal place of business in New York.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11. Venue is proper in the Central District of California (and its Western Division), pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this action occurred in this District.

12. This action includes a request for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202. An actual controversy within the meaning of 28 U.S.C. § 2201 exists between the parties.

## THE UNDERLYING LAWSUITS

13. Pacific World is a privately-held California corporation that supplies branded and private label personal and beauty care products, such as artificial nails, false eyelashes, nail polish, and nail-care implements, to retail stores. In 2009, LLCP acquired Pacific World as an investment portfolio company. In 2018, a dispute arose between LLCP and Prospect Capital Corporation ("Prospect"), which had loaned Pacific World $215 million in 2014. In May 2018, Prospect declared the loan in default, seized voting control of Pacific World's common stock, and replaced Pacific World's directors and officers. Litigation followed.

14. On September 24, 2018, Pacific World filed a Complaint in *Pacific World Corp. v. Levine Leichtman Capital Partners, Inc.*, Case No. SC129889

(Superior Court, Los Angeles, Cal.) (the "*Pacific World* Action"). The next day, on September 25, 2018, Prospect filed a Complaint in *Prospect Capital Corp. v. Levine Leichtman Capital Partners, Inc., et al.*, Case No. SS029343 (Superior Court, Los Angeles, Cal.) (the "*Prospect Capital* Action" and, collectively with the *Pacific World* Action, the "Underlying Lawsuits").

15. Pacific World and Prospect (collectively, "Plaintiffs") were represented in the Underlying Lawsuits by the same counsel, and the Underlying Lawsuits contained nearly identical allegations.

16. Plaintiffs alleged that certain of Pacific World's former directors—namely Arthur Levine, Lauren Leichtman, Kimberly Pollack, Steven Hartman, and James Colleran (collectively, the "Director Defendants")—caused Pacific World to obtain the $215 million loan from Prospect in September 2014, and then used the loan to make (i) a $62 million distribution to Pacific World's sole shareholder, PWC Holding, which subsequently transferred $57 million to its shareholders, including Levine Leichtman Capital Partners IV, L.P. ("LLCP IV") and PWC Investments Group, LLC ("PWC Investments"), which are affiliates of LLCP, (ii) an $87 million payment to the Bank of Montreal to pay off Pacific World's senior credit facility, and (iii) a $47 million payment to LLCP IV to pay off subordinated debt.

17. Pacific World alleged, in the *Pacific World* Action, that the Director Defendants breached their fiduciary duties to Pacific World by approving the 2014 transaction, and that they were liable as former directors of Pacific World under Sections 316, 500, and 501 of the California Corporations Code for approving an unlawful distribution in connection with the transaction.

18. Pacific World alleged that LLCP, which had owned 90% of Pacific World's shares and placed the Director Defendants (except for Mr. Colleran, who was not affiliated with LLCP) on Pacific World's board, breached its fiduciary duties to Pacific World as a *de facto* director by approving the 2014 transaction.

Pacific World also alleged that LLCP, LLCP IV, and PWC Investments (collectively, the "LLCP Entities") aided and abetted the Director Defendants' breach of fiduciary duties owed to Pacific World.

19. Pacific World sought to hold the Director Defendants and the LLCP Entities liable for damages to Pacific World, including the amount of the allegedly illegal distributions.

20. Prospect alleged in the *Prospect Capital* Action that LLCP IV and PWC Investments received fraudulent and voidable transfers as part of the 2014 transaction.

21. Prospect also alleged that the Director Defendants and LLCP aided and abetted the fraudulent transfers by approving the 2014 transaction. Additionally, Prospect alleged that the Defendant Directors engaged in a civil conspiracy to commit fraudulent transfer by approving the 2014 transaction.

22. Prospect sought to recover from the Director Defendants and the LLCP Entities in the *Prospect Capital* Action the same amounts that Pacific World sought to recover from them as damages in the *Pacific World* Action: the allegedly illegal distributions paid as part of the 2014 transaction.

## THE ADVANCEMENT ACTIONS

23. The Director Defendants demanded that Pacific World advance their defense costs incurred in defending themselves in the Underlying Lawsuits and indemnify them for a settlement or judgment pursuant to Pacific World's Bylaws. Pacific World refused.

24. In December 2018, the Director Defendants and the LLCP Entities instituted lawsuits captioned *Levine Leichtman Capital Partners, LLC, et al. v. Pacific World Corp.*, Case No. 18SMCV00360 (Superior Court, Los Angeles, Cal.), and *James Colleran v. Pacific World Corp.*, Case No. 18SMCV00414 (Superior Court, Los Angeles, Cal.) (the "Advancement Actions"), seeking to require Pacific

World to satisfy its obligation to advance their defense costs and indemnify them in response to the Underlying Lawsuits.

## THE POLICIES

### *The AIG Policy*

25. AIG issued Directors & Officers Liability Insurance, Employment Practices Liability Insurance, Fiduciary Liability Insurance Policy No. 02-477-00-77 (the "AIG Policy") to PWC Holding for the Policy Period from November 1, 2017 to November 1, 2019. (*See* AIG Policy, Declarations, and End. No. 39, Program Participant Endorsement). The AIG Policy states that PWC Holding is a California corporation located in Lake Forest, California. (*See id.*, End. No. 39, Item 1).

26. The AIG Policy states that PWC Holding is the Named Entity, and LLCP is the Insureds' Representative. (*See id.*, Decls., Item 7, and End. No. 39, Item 1).

27. The AIG Policy has a $10 million limit of liability applicable to its Directors, Officers and Private Company Liability Insurance (the "D&O Coverage Section"). (*See id.*, End. No. 39, Item 2). The AIG Policy also has an additional $1 million limit of liability applicable to Coverage A of the D&O Coverage Section. (*See id.*, Item 3.f.). The AIG Policy's additional $1 million Side A limit attaches upon the exhaustion of the AIG Policy's $10 million limit of liability. (*See id.*, D&O Coverage, § 5.).

28. Coverage A of the AIG Policy's D&O Coverage Section's Insuring Agreement provides that it "shall pay the Loss of an Individual Insured arising from a Claim made against such Individual Insured for any Wrongful Act of such Individual Insured, except when and to the extent that the Company has indemnified such Individual Insured." (*See id.*, D&O Coverage, § 1).

29. The term "Individual Insured" includes any Executive or Employee of a Company. (*See id.*, D&O Coverage, § 2.(q)).

30. The term "Company" includes PWC Holding Corporation and any Subsidiary. (*See id.*, General Terms and Conditions ("GT&C"), § 2.(f), and End. No. 39, Item 1).

31. The term "Claim" includes "any civil, criminal, administrative or regulatory proceeding or arbitration, mediation or other dispute resolution proceeding for monetary or non-monetary or injunctive relief which is commenced by . . . service of a complaint, motion, writ or similar pleading or service of an order." (*See id.*, GT&C, § 2.(d)(ii)).

32. The term "Wrongful Act" is defined to mean, "with respect to any Executive or Employee of a Company, any actual or alleged act, breach of duty, neglect, error, statement, misstatement, misleading statement, or omission by such Executive or Employee in their respective capacities as such, or any matter claimed against such Executive or Employee of a Company by reason of his or her status as an Executive or Employee of a Company." (*See id.*, D&O Coverage, § 2.(dd)).

33. The term "Loss" includes "damages, judgments, [and] settlements," as well as Defense Costs. (*See id.*, § 2.(u)).

34. The AIG Policy includes an "Other Insurance" clause providing that it "shall apply as primary insurance with respect to . . . any private equity or venture capital liability, general partner liability, or other similar management or professional liability insurance maintained by any direct or indirect shareholder of the Named Entity [PWC Holding Corporation] including any liability policy maintained by the Insureds' Representative [LLCP][.]" (*See id.*, GT&C, § 11).

### *The Steadfast Policy*

35. Steadfast Insurance Company ("Steadfast") issued a Management and Professional Liability Insurance Policy No. EOC 1067176-00 to LLCP for the Policy Period from November 19, 2017 to November 19, 2019 (the "Steadfast Policy"). (*See* Steadfast Policy, Decls., Items 1 and 2).

36. The Steadfast Policy has a $10 million limit of liability for all Claims under its Management and Professional Liability Coverage Part. (*See id.*, Decls. Item 3(a)).

37. The Steadfast Policy's Insuring Agreement provides, in pertinent part, as follows:

> (A) The Insurer shall pay on behalf of each Insured Person, all Loss which an Insured Entity does not actually pay as indemnification to such Insured Person and which the Insured Person incurs on account of any Claim first made against such Insured Person, individually or otherwise, during the Policy Period or, if applicable, the Optional Extension Period, for Wrongful Acts.
>
> (B) The Insurer shall pay on behalf of an Insured Entity, all Loss which an Insured Entity actually pays, or agrees to pay, as indemnification for, or on behalf of, each Insured Persons, which the Insured Persons incurs on account of any Claim first made against such Insured, individually or otherwise, during the Policy Period or, if applicable, the Optional Extension Period, for Wrongful Acts.

(*Id.*, Management and Prof'l Liab. Coverage Part, § I.).

38. The Steadfast Policy's definition of "Insured" means each Insured Entity and the Insured Persons. (*See id.*, General Terms and Conditions, § I.(K)).

39. The term "Insured Entity" includes the LLCP Entities and PWC Holding. (*See id.*, § I(L)).

40. The term Insured Persons includes any director of an Insured Entity or "any past, present or future natural person serving, or having served, in an Outside Capacity at the specific request or direction of an Insured[.]" (*See id.*, §§ I.(I) and I.(M)).

41. The Steadfast Policy defines the term "Outside Capacity" to mean, in pertinent part, "any past, present or future service by an Insured Person or other natural person . . . serving or having served at an Insured's request as a director, officer, general partner, managing partner, manager, managing member, trustee, regent, governor, consultant, advisor, board observer, member of the Board of Managers, member of the management board, member of the supervisory board, or member of any board, operational, management, oversight or committee role or position, of any Outside Entity." (*Id.*, § I.(U)).

42. The term Outside Entity is defined to mean, in pertinent part, "any Portfolio Company," which includes Pacific World. (*See id.*, § I.(V) and I.(X)).

43. The Steadfast Policy defines "Claim" to include a civil proceeding commenced by the filing or service of a complaint against an Insured. (*See id.*, GT&C, § I(D)(2)).

44. The Steadfast Policy includes an "Other Insurance" clause confirming the Steadfast Policy's "excess" position over other insurance available to an Outside Entity, such as Pacific World. In particular, the Steadfast Policy states under the heading "SERVICE IN CONNECTION WITH OUTSIDE ENTITIES," that "this Policy shall be specifically excess of . . . any amounts actually paid to such Insured Person under any other valid and collectible insurance maintained by the applicable Outside Entity covering such Insured Person for his or her service in such Outside Capacity." (Steadfast Policy, Management and Prof'l Liab. Coverage Part, § V.(B)(1)).

45. The Steadfast Policy further provides that, "if Loss from such Claim is not paid to, or on behalf of, an Insured Person by such valid and collectible insurance" for any reason, "then this Policy will respond on behalf of the Insured Person as if it were primary," but "without prejudice to the Insurer's excess position." (*Id.*).

46. Finally, the Steadfast Policy includes a subrogation clause, stating that "[i]n the event of any payment under this Policy, the Insurer shall be subrogated to all of the potential or actual rights of recovery of the Insured up to the amount of the applicable paid loss." (*Id.*, GT&C, § II.(K)(2)).

*The XL Excess Policy*

47. XL issued Excess Insurance Policy No. ELU153018-17 (the "XL Excess Policy") to LLCP for the policy period from November 19, 2017 to November 19, 2018. (XL Excess Policy, Decls., Items 1 and 2).

48. The XL Excess Policy, which has a $10 million limit of liability, applies excess of the Steadfast Policy, and attaches only after the Steadfast Policy is exhausted by actual payment of covered amounts by Steadfast. (*See id.*, Decls., Items 3 and 4, and § II).

49. In the event of such exhaustion of the Steadfast Policy, the XL Excess Policy applies in conformance with the Steadfast Policy's terms, conditions, endorsements and warranties, including its other insurance and subrogation clauses. (*See id.*, § I.).

**DEFENSE AND SETTLEMENT OF THE UNDERLYING LAWSUITS**

50. By letter dated October 30, 2018, Steadfast acknowledged potential coverage for the Underlying Lawsuits under the Steadfast Policy. Steadfast advised that the LLCP Entities were Insured Entities and that the Director Defendants were Insured Persons under the Steadfast Policy.

51. By letters dated January 7, 2019 and July 10, 2019, AIG acknowledged that the AIG Policy afforded coverage for the Director Defendants in response to the Underlying Lawsuits. AIG also acknowledged in its July 10, 2019 letter that the Director Defendants were not being indemnified by Pacific World.

52. The Director Defendants and the LLCP Entities presented a joint defense to the Underlying Lawsuits, and were represented by the same defense

counsel.  An allocation of coverage for that joint defense was necessary because the AIG Policy provided the primary coverage for the Director Defendants, but did not provide coverage for the LLCP Entities.  Only the Steadfast Policy afforded primary coverage for the LLCP Entities.

53. To allocate their respective share of coverage for the joint defense, AIG and Steadfast initially agreed to allocate 80% of the coverage to AIG and 20% to Steadfast.  Beginning in August 2019, however, the insurers agreed to modify the allocation so that AIG became responsible for 55% of coverage with Steadfast responsible for 45%.

54. AIG and Steadfast paid defense costs based on the agreed-to allocation from the outset of the Underlying Lawsuits through December 2019.  For that time period, AIG paid about $7.2 million in defense costs for the Director Defendants and Steadfast paid nearly $3 million.

55. Following a mediation in January 2020, the parties to the Underlying Lawsuits and the Advancement Actions agreed to settle those matters for $11 million to be paid by AIG, Steadfast and XL.

56. Although the Side A Insuring Agreement in AIG's Policy was triggered as a result of Pacific World's refusal to indemnify the Director Defendants or advance their defense costs, AIG wrongly refused to contribute the additional $1 million Side A limit provided by the AIG Policy and claimed that its limit was only $10 million.

57. Instead, AIG paid the balance of its $10 million D&O limit (i.e., $2.8 million) toward the settlement and, without explanation, declared the AIG Policy exhausted despite the fact that its $1 million Side A limit remained unpaid.

58. Steadfast exhausted the Steadfast Policy's limit of liability through payment of its allocated share of the defense costs (i.e., $2,988,596.98) and

COMPLAINT

contributing the balance of its limit (i.e., $7,011,403.02) to the settlement payment for the Underlying Lawsuits and Advancement Actions.

59. XL demanded that AIG pay its $1 million "Side A" limit in a voicemail on March 3, 2020, and an email on March 19, 2020. XL advised that AIG had failed to honor its contractual obligations under the AIG Policy and urged AIG to contact it if there were any questions or need for discussion. AIG did not respond to XL's communications.

60. To ensure that the Underlying Lawsuits settled and without waiver of its rights to seek reimbursement from AIG, XL has paid a total of $3,199,537.74 towards the defense and settlement of the Underlying Lawsuits. Because AIG's Policy provides primary coverage for the Director Defendants and the applicable limit of the AIG Policy is $11 million (not $10 million as AIG claimed), XL's payment is $1 million more than it rightly owes.

61. XL has demanded that AIG pay the additional $1 million it owes, but AIG has refused.

62. On June 23, 2020, pursuant to the AIG Policy's Dispute Resolution Process provision, XL and AIG participated in a non-binding mediation that did not result in a resolution of the parties' dispute.

## COUNT I: CONTRACTUAL SUBROGATION

63. XL repeats and incorporates by reference the allegations in paragraphs 1 through 62 of this Complaint.

64. The Steadfast Policy, to which the XL Excess Policy follows form, states, in pertinent part, that "[i]n the event of any payment under this Policy, the Insurer shall be subrogated to all of the potential or actual rights of recovery of the Insured up to the amount of the applicable paid Loss." (Steadfast Policy, § II.(K)(2)).

65. After exhaustion of the Steadfast Policy, XL paid $3,199,537.74 under the XL Excess Policy for the defense and settlement of the Underlying Lawsuits and Advancement Actions.

66. This payment was made on behalf of the Director Defendants who qualify as Insureds under the Steadfast Policy and XL Excess Policy.

67. Accordingly, XL is contractually subrogated to all of the potential or actual rights of recovery of the Director Defendants.

68. The Director Defendants are Individual Insureds under the AIG Policy, and AIG had a duty to provide defense and indemnity coverage to the Director Defendants for the Underlying Lawsuits and Advancement Actions up to the AIG Policy's total applicable limits of liability.

69. The AIG Policy's coverage for the Director Defendants is primary to the coverage afforded to the Director Defendants under the Steadfast and XL Excess Policies.

70. Therefore, AIG should have paid both the AIG Policy's $10 million D&O limit of liability and its additional $1 million "Side A" limit of liability for the defense and settlement of the Underlying Lawsuits and Advancement Actions.

71. However, AIG breached its obligations under the AIG Policy by refusing to pay any part of its $1 million "Side A" limit of liability to defend or indemnify the Director Defendants in connection with the Underlying Lawsuits and Advancement Actions.

72. The Director Defendants complied with all of the terms, conditions, and prerequisites to coverage set forth in the AIG Policy.

73. Accordingly, the Director Defendants have an actual right to recover $1 million under the AIG Policy, and XL Specialty is contractually subrogated to those rights.

## COUNT II: EQUITABLE SUBROGATION

74. XL repeats and incorporates by reference the allegations in paragraphs 1 through 73 of this Complaint.

75. The Director Defendants are Individual Insureds under the AIG Policy, and AIG had a duty to provide defense and indemnity coverage to the Director Defendants for the Underlying Lawsuits and Advancement Actions up to the AIG Policy's total applicable limits of liability

76. AIG should have paid both the AIG Policy's $10 million D&O limit of liability and its additional $1 million "Side A" limit of liability for the defense and settlement of the Director Defendants in connection with the Underlying Lawsuits and Advancement Actions.

77. However, AIG wrongfully refused to pay any part of its $1 million "Side A" limit of liability to defend or indemnify the Director Defendants in connection with the Underlying Lawsuits and Advancement Actions.

78. Because of AIG's wrongful denial of coverage, XL was compelled to pay $3,199,537.74 for the defense and settlement of the Underlying Lawsuits and Advancement Actions, instead of paying only $2,199,537.74, a difference of $1 million.

79. The AIG Policy was primarily liable for any loss incurred by the Director Defendants resulting from Underlying Lawsuits and Advancement Actions. By virtue of its position as "excess" insurance, the XL Excess Policy was secondarily liable for the same loss.

80. XL suffered damages of at least $1 million caused by AIG's wrongful denial of coverage for the Underlying Lawsuits and Advancement Actions.

## COUNT III: DECLARATORY JUDGMENT

81. XL repeats and incorporates by reference the allegations in paragraphs 1 through 80 of this Complaint.

82. An actual and present controversy has arisen and now exists between XL and AIG concerning their respective rights and obligations under the AIG Policy and the XL Excess Policy.

83. XL requests, and the interests of the parties to this action requires, a judicial determination of those rights and obligations.

84. XL therefore seeks a ruling from this Court that: (1) AIG had a duty to provide defense and indemnity coverage for the Director Defendants up to the AIG Policy's total applicable limits of liability in response to the Underlying Lawsuits and Advancement Actions; (2) AIG should have paid both the AIG Policy's $10 million D&O limit of liability and its additional $1 million "Side A" limit of liability for the defense and settlement of the Underlying Lawsuits and Advancement Actions; (3) AIG breached its duties by paying only the AIG Policy's $10 million D&O limit and refusing to pay the $1 million "Side A" limit; (4) the XL Excess Policy's coverage for the Director Defendants applies only excess of the coverage afforded by the AIG Policy; (5) AIG's refusal to pay the AIG Policy's $1 million "Side A" limit caused XL to pay $1 million more for the defense and settlement of the Underlying Lawsuits and Advancement Actions than it should have paid; and (6) AIG is obligated to reimburse XL in the amount of $1 million, with pre- and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, XL prays for judgment as follows:

(a) Under Counts I and II, for compensatory damages of at least $1 million;

(b) Under Count III, for a declaration of the parties' rights, duties and obligations under the subject policies, and specifically a declaration that XL's contentions are correct;

(c) For pre-judgment and post-judgment interest in accordance with law;

1  (d) For expenses and costs incurred in this action; and
2  (e) For such other and further relief as this Court deems just and proper.

## JURY DEMAND

XL demands a trial by jury on all issues triable to a jury.

DATED: July 23, 2020              DYKEMA GOSSETT LLP


By: /s/ Ashley R. Fickel
    ASHLEY R. FICKEL
    Attorneys for Plaintiff
    XL SPECIALTY INSURANCE
    COMPANY