JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

XL Specialty Insurance Company,

Plaintiff,

v.

AIG Specialty Insurance Company,

Defendant.

2:20-cv-06540-VAP-SHKx

**Order GRANTING Plaintiff's Motion for Summary Judgment (Dkt. No. 32) and DENYING Defendant's Motion for Summary Judgment (Dkt. No. 33)**

Before the Court are Plaintiff XL Specialty Insurance Company's Motion for Summary Judgment and Defendant AIG Specialty Insurance Company's Motion for Summary Judgment.  Having considered the papers filed in support of, and in opposition to, the Motions, as well as the arguments advanced at the hearing, the Court GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendant's Motion for Summary Judgment for the following reasons.

## I.    BACKGROUND

On July 23, 2020, Plaintiff XL Specialty Insurance Company ("Plaintiff") initiated this action by filing a Complaint against Defendant AIG Specialty Insurance Company ("Defendant") with the following claims for: (1) contractual subrogation; (2) equitable subrogation; and (3) a declaratory

1

United States District Court
Central District of California

judgment.  In the Complaint, Plaintiff alleged Defendant was obligated to pay the full limit of a $10 million directors and officers insurance policy in addition to a "Side A" limit of $1 million to defend and settle several underlying actions, but Defendant failed to pay the additional $1 million "Side A" limit, which caused Plaintiff to pay it.  In the Complaint, Plaintiff sought reimbursement of the $1 million, in addition to pre- and post-judgment interest.

On September 1, 2020, Defendant filed an Answer to the Complaint and raised twenty-five affirmative defenses.

On June 14, 2021, Plaintiff filed its Motion for Summary Judgment, in addition to a Statement of Uncontroverted Facts and Conclusions of Law ("Plaintiff's SUF"), including 93 facts, and the Declaration of Ashley Sakakeeny ("Sakakeeny Decl."), attaching Exhibits A through Q.

Also on June 14, 2021, Defendant filed its Motion for Summary Judgment, a Statement of Undisputed Facts ("Defendant's SUF"), including 52 facts, the Declaration of Michael J. Hartley ("Hartley Decl."), and an Appendix of Evidence, attaching Exhibits 1 through 40.

On June 21, 2021, the parties opposed each other's Motion.  Plaintiff filed its Opposition in addition to a Statement of Genuine Issues ("Plaintiff's SGI") and Supplemental Statement of Undisputed Facts ("Plaintiff's SSUF"), including 5 additional facts.  Defendant filed its Opposition as well as its Opposition to Plaintiff's Statement of Uncontroverted Facts and Conclusions of Law ("Defendant's SGI"), including 43 additional undisputed facts ("Defendant's SSUF").

On June 28, 2021, the parties filed replies to each other's opposition papers.  Plaintiff filed its Reply to Defendant's Opposition but did not file a separate response to Defendant's SGI or SSUF.  Defendant filed its Reply to Plaintiff's Opposition and a Reply to Plaintiff's SGI and Plaintiff's SSUF.

## II.    LEGAL STANDARD

A motion for summary judgment or partial summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits."  Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotations and citations omitted).  Thus, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."  Id. (quoting Wright, et al., Federal Practice and Procedure § 2720, at 335-36 (3d ed. 1998)).  If, however, the cross-motions are before the court at the same time, the court must consider the evidence proffered by both sets of motions before ruling on either one.  Riverside Two, 249 F.3d at 1135-36.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment.  Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998).  "The moving party may produce evidence negating an essential element of the nonmoving party's case, or . . . show that the nonmoving

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

United States District Court
Central District of California

party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1106 (9th Cir. 2000) (reconciling Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).  The nonmoving party must then "do more than simply show that there is some metaphysical doubt as to the material facts" but must show specific facts which raise a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  A genuine issue of material fact will exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248.

In ruling on a motion for summary judgment, a court construes the evidence in the light most favorable to the non-moving party.  Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991).  "[T]he judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## III.  EVIDENTIARY ISSUES

The parties do not lodge objections to the evidence submitted in support of, or in opposition to the instant Motions.  The Court, however, has reviewed independently the admissibility of the evidence that both parties submitted.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (noting at the summary judgment stage, a district court should "focus on the admissibility of the [evidence's] contents" and not the form in which the evidence is presented because it is sufficient that a party will be able to

4

produce evidence in its admissible form at trial); Block v. City of L.A., 253
F.3d 410, 418-19 (9th Cir. 2001).

**A.     Defendant's Evidence**

Having reviewed each party's evidence, the Court points out
Defendant failed to provide proper authentication for two of its exhibits,
Exhibits 9 and 10.

"A trial court can only consider admissible evidence in ruling on a
motion for summary judgment." Orr v. Bank of Am., NT & SA, 285 F.3d 764,
773 (9th Cir. 2002); see also Weil v. Citizens Telecom Servs. Co., 922 F.3d
993, 998 (9th Cir. 2019) ("we may only consider admissible evidence when
reviewing a motion for summary judgment").  At the summary judgment
stage, district courts consider evidence with content that would be
admissible at trial, even if the form of the evidence would not be admissible
at trial.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003); Block
v. City of L.A., 253 F.3d 410, 418-19 (9th Cir. 2001).   Federal Rule of
Evidence 901(a) permits authentication "by evidence sufficient to support a
finding that the matter in question is what the proponent claims."  Fed. R.
Evid. 901(a).  "Authentication is a 'condition precedent to admissibility.'"  Orr,
285 F.3d at 773 (quoting Fed. R. Evid. 901(a)).

Defendant authenticates most of its exhibits filed in support of its
Motion through the Declaration of Michael Hartley, defense counsel, who
attests that each exhibit is a "true and correct" copy of the document it
purports to be and provides additional information, namely that a deponent
whose authenticated deposition transcript is also presented as an exhibit,

United States District Court
Central District of California

United States District Court
Central District of California

1   authenticated each exhibit during his or her deposition, which authenticates

2   the document properly.  The Hartley Declaration also explains certain

3   exhibits were produced in discovery by Plaintiff, which provides sufficient

4   authentication to satisfy Rule 901.  See Orr, 285 F.3d at 777; Maljack

5   Prods., Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 889 n.12 (9th

6   Cir. 1996).  This is not true for Exhibits 9, 10, however.[1]

7        In any event, the Court considers Defendant's Exhibits 9 and 10

8   because Plaintiff has authenticated these documents properly in its motion

9   papers.  Defendant's Exhibit 9 is submitted by Plaintiff in support of its

10  Motion as Exhibit F to the Sakakeeny Declaration and Plaintiff sets forth

11  sufficient authentication for the document in ¶ 11 of the Sakakeeny

12  Declaration.  See Orr, 285 F.3d at 776 ("when a document has been

13  authenticated by a party, the requirement of authenticity is satisfied as to

14  that document with regard to all parties, subject to the right of any party to

15  present evidence to the ultimate fact-finder disputing its authenticity.").

16  Likewise, Defendant's Exhibit 10 was also submitted by Plaintiff as Exhibit I

17  to the Sakakeeny Declaration in support of its Motion and ¶ 17 of the

18  Sakakeeny Declaration provides proper authentication for the document.  Id.

19       Next, the Court notes Defendant repeated several of its SUFs from its

20  moving papers in its SSUF, yet used different SUF numbers.  The Court has

21  compared Defendant's submissions and it appears the only new facts

22

23       [1] The Court notes Defendant's Exhibits 9 and 10 have been stamped with
      Bates numbers that suggest these documents were produced by Plaintiff
24    in discovery.  If that is true, there would be no authentication issue with
      respect to these documents.  See id.  The Hartley Declaration, however,
25    does not attest Plaintiff produced Exhibits 9 and 10.

26

                                        6

United States District Court
Central District of California

Defendant includes in the SSUF that are not included in its SUF filed in support of its Motion are SSUF Nos. 17 and 43.  When discussing the undisputed facts below, the Court will cite only to Defendant's SUFs set forth in support of its Motion and the two new facts set forth in Defendant's SSUF.

**B.    Request for Judicial Notice**

The Court next turns to Defendant's Request for Judicial Notice ("RJN") in support of its Motion.[2]  Defendant moves the Court to take judicial notice of the following documents: (1) a complaint filed on September 24, 2018 in <u>Pacific World Corporation v. Levine Leichtman Capital Partners, et al.</u>, case no. SC129889 before the Los Angeles Superior Court ("LASC") (Defendant's Exhibit 32); (2) a complaint filed on September 25, 2018 in <u>Prospect Capital Corporation v. Levine Leichtman Capital Partners, Inc., et al.</u>, case no. SS029343 before the LASC (Defendant's Exhibit 7); (3) a complaint filed on December 12, 2018 in <u>Levine Leichtman Capital Partners, Inc., et al. vs. Pacific World Corporation</u>, case no. 18MCV00360 before the LASC (Defendant's Exhibit 17); (4) an amended complaint filed on December 12, 2018 in <u>Prospect Capital Corporation v. Levine Leichtman Capital Partners, Inc., et al.</u>, case no. SS029343 before the LASC (Defendant's Exhibit 18); (5) an amended complaint filed on December 12,

---

[2] Some of the exhibit numbers set forth in the RJN were incorrect.  For example, the RJN in ¶ 3 refers to Defendant's Exhibit 18, when in fact the true document the RJN is referencing is Defendant's Exhibit 17.  The same is true for: ¶ 4, which should refer to Defendant's Exhibit 18 instead of 19; ¶ 5, which should refer to Defendant's Exhibit 19 instead of 20; and ¶ 6, which should refer to Defendant's Exhibit 20 instead of 21.

2018 in <u>Pacific World Corporation v. Levine Leichtman Capital Partners,</u> <u>Inc., et al.</u>, case no. SC129889 before the LASC (Defendant's Exhibit 19); (6) a complaint filed on December 21, 2018 in <u>Colleran v. Pacific World</u> <u>Corporation</u>, case no. 18SMCV00414 before the LASC (Defendant's Exhibit 20); (7) a minute order entered on January 25, 2019 by the LASC in case nos. SS029343 and SC129889 (Defendant's Exhibit 33); (8) a motion to consolidate related cases filed on February 13, 2019 in case no. SC129889 before the LASC (Defendant's Exhibit 34); (9) a minute order entered on April 4, 2019 by the LASC in case nos. SS029343 and SC129889 (Defendant's Exhibit 35); (10) an order entered on April 4, 2019 by the LASC in case nos. SS029343 and SC129889 (Defendant's Exhibit 36); (11) the docket of case no. SS029343 before the LASC (Defendant's Exhibit 37); (12) the docket sheet for case no. SC129889 before the LASC (Defendant's Exhibit 38); (13) the docket sheet for case no. 18SMCV00360 before the LASC (Defendant's Exhibit 39); and (14) the docket of case no. 18SMCV00414 before the LASC (Defendant's Exhibit 40).

Pursuant to Federal Rule of Evidence 201, a court may properly take judicial notice of matters in the public record. <u>See</u> <u>Marder v. Lopez</u>, 450 F.3d 445, 448 (9th Cir. 2006). A court may take judicial notice of a public record not for the truth of the facts recited in the document, but for the existence of the matters therein that cannot reasonably be questioned. <u>See</u> Fed. R. Evid. 201. The court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." <u>U.S. ex rel.</u> <u>Robinson Rancheria Citizens Council v. Borneo, Inc.</u>, 971 F.2d 244, 248 (9th

8

United States District Court
Central District of California

1  Cir. 1992) (citation omitted).  In <u>Khoja v. Orexigen Therapeutics</u>, the Ninth

2  Circuit explained a court may take "judicial notice of matters of public

3  record," but "cannot take judicial notice of disputed facts contained in such

4  public records."  <u>Khoja v. Orexigen Therapeutics</u>, 899 F.3d 988, 999 (9th Cir.

5  2018) (citation and quotations omitted).  If a court takes judicial notice of a

6  document, it must specify what facts it judicially noticed from the document.

7  <u>Id.</u>

8         Here, the Court finds the complaints filed before the LASC in the

9  underlying related actions, set forth in Defendant's Exhibits 32, 7, and 17-

10  20, to be relevant to the Court's analysis of the issues raised in the Motions.

11  Namely, the complaints set forth the parties to the actions as well as the

12  nature of the claims alleged, which determined what insurance coverage

13  was at issue.  Likewise, the Court concludes the docket sheets of each of

14  those cases pending before the LASC, <u>i.e.</u>, Defendant's Exhibits 37 through

15  40, are also relevant here as evidence of the course of each litigation.  The

16  Court takes judicial notice of Defendant's Exhibits 7, 17-20, 32, and 37-40.

17         The Court declines to take judicial notice of Defendant's Exhibits 33

18  through 35, as those matters are not relevant to the Court's analysis here.

19  The Court notes none of Defendant's SUFs cite to or rely on Exhibits 33

20  through 35.

21

22  **C.    Plaintiff's Evidence**

23         To the extent the Court has taken judicial notice of the foregoing

24  documents presented by Defendant in support of its Motion, the Court also

25  takes judicial notice of them for purposes of evaluating Plaintiff's Motion.

26

Riverside Two, 249 F.3d at 1135-36.

The Court also points out the parties submit many of the same documents as exhibits in support of their respective Motions.  Throughout this Order, the Court will cite to the applicable evidence and does not cite to both versions presented by the parties.

## IV.   FACTS

To the extent certain facts or contentions are not mentioned in this Order, the Court has not found it necessary to consider them in reaching its decision.

### A.   Undisputed Facts

The following material facts are supported adequately by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for the purposes of deciding Plaintiff's and Defendant's Motions, respectively.  See C.D. Cal. L.R. 56-3.

#### 1.   Underlying Lawsuits

On September 24, 2018, Pacific World Corporation (hereinafter "Pacific World") filed a complaint against Levine Leichtman Capital Partners, Inc. ("LLCP") before the Los Angeles Superior Court ("LASC") in case no. SC129889.  (Pl. SUF No. 1.)  On September 25, 2018, Prospect Capital Corporation (hereinafter "Prospect Capital") filed a complaint against LLCP before the LASC in case no. SS029343.  (Pl. SUF No. 2.)  These two actions are referred to collectively as the "Underlying Lawsuits."  Pacific

United States District Court
Central District of California

World and Prospect Capital were represented in the Underlying Lawsuits by the same counsel and both actions contained nearly identical allegations. (Pl. SUF No. 3.)  Amended complaints were filed in the Underlying Lawsuits on December 12, 2018.  (Pl. SUF No. 4.)  The LASC consolidated both actions for pre-trial purposes.  (Def. SUF No. 10.)

In the underlying Pacific World action, Pacific World made the following pertinent allegations.  Pacific World was a private California corporation that supplied personal care and beauty products to retail stores and it was acquired by LLCP in 2009.  (Pl. SUF Nos. 5-6.)  LLCP owned 90% of Pacific World's shares and placed Arthur Levine, Lauren Leichtman, Kimberly Pollack, Steven Hartman, and James Colleran ("Director Defendants") on Pacific World's board of directors.  (Pl. SUF No. 13.)  In September 2014, Prospect Capital loaned Pacific World $215 million.  (Pl. SUF No. 7.)  The Director Defendants caused Pacific World to obtain the loan from Prospect Capital and then used the loan to make three payments. (Pl. SUF No. 9.)  The first payment was a $62 million distribution to Pacific World's sole shareholder, PWC Holding, which transferred $57 million to its shareholders, including Levine Leichtman Capital Partners IV, L.P. ("LLCP IV"), PWC Investments Group LLC ("PWC Investments"), both of which are affiliates of LLCP.  (Id.)  The second payment was to the Bank of Montreal to pay off Pacific World's senior credit facility in the amount of $87 million.  (Id.) The third payment was to LLCP IV to pay off a subordinated debt in the amount of $47 million.  (Id.)

In May 2018, Prospect Capital declared the loan in default.  (Pl. SUF No. 8; Def. SUF No. 3.)  Upon declaring the default, Prospect Capital seized

11

voting control of Pacific World's common stock and replaced its board of directors and officers.  (Pl. SUF No. 8.)  The Underlying Lawsuits were filed shortly thereafter.  (Pl. SUF Nos. 1-2.)  Pacific World alleged its claims against each of the Director Defendants arose from their conduct as board members of Pacific World.  (Pl. SUF No. 10.)  Pacific World alleged the Director Defendants breached their fiduciary duties to Pacific World by approving the 2014 loan transaction and were liable as former directors of Pacific World for approving an unlawful distribution in connection with the transaction.  (Pl. SUF Nos. 11, 12; Def. SUF No. 8.)  Pacific World also alleged LLCP breached its fiduciary duties to Pacific World as a de facto director by approving the 2014 transaction.  (Pl. SUF No. 13; Def. SUF No. 8.)  In addition, Pacific World alleged LLCP, LLCP IV, LLCP Partners IV GP, LLC, and PWC Investments ("LLCP Entities") aided and abetted the Director Defendants' breach of fiduciary duties to Pacific World.  (Pl. SUF No. 14; Def. SUF No. 8.)  Pacific World sought damages from the Director Defendants and LLCP Entities including the amount of the distributions made to the LLCP Entities.  (Pl. SUF No. 15.)

In the underlying Prospect Capital action, Prospect Capital made the following pertinent allegations.  LLCP IV and PWC Investments received fraudulent and voidable transfers as part of the 2014 Pacific World loan transaction.  (Pl. SUF No. 16; Def. SUF No. 9.)  The Director Defendants and LLCP aided and abetted the fraudulent transfers and engaged in civil conspiracy by approving the 2014 transaction.  (Pl. SUF Nos. 17-18; Def. SUF No. 9.)  Prospect Capital's claims against the Director Defendants arose from their conduct as Pacific World board members.  (Pl. SUF No. 19;

Def. SUF No. 9.)  Prospect Capital sought damages from the Director Defendants and LLCP Entities in the amount of the distributions made to the LLCP Entities.  (Pl. SUF No. 20.)

In December 2018, the Director Defendants and LLCP Entities filed complaints against Pacific World before the LASC in case nos. 18SMCV00360 and 18SMCV00414 (hereinafter "Advancement Actions"). (Pl. SUF No. 21.)  The Advancement Actions set forth the following allegations.  The Director Defendants demanded that Pacific World advance their defense costs incurred in the Underlying Lawsuits and indemnify them for a settlement or judgment pursuant to Pacific World's bylaws.  (Pl. SUF No. 22.)  Pacific World refused to advance the Director Defendants' defense costs or indemnify them for the Underlying Lawsuits.  (Pl. SUF No. 23; Def. SUF No. 12.)  By filing the Advancement Actions, the Director Defendants and LLCP Entities sought to require Pacific World to advance their defense costs and indemnify them.  (Pl. SUF No. 24.)  Pacific World contested the Advancement Actions and did not advance or indemnify against any expenses the Director Defendants incurred as a result of defending against the Underlying Lawsuits.  (Pl. SUF No. 25.)

No substantive rulings were issued, no factual findings were made, and no dispositive motions were filed in the Underlying Lawsuits or the Advancement Actions.  (Def. SUF No. 15.)  Following a mediation session in January 2020, the Underlying Lawsuits and Advancement Actions were settled, as discussed in more detail below.  (Pl. SUF Nos. 80, 82.)

### 2.     The AIG Policy[3]

Defendant AIG Specialty Insurance Company issued a "Directors & Officers Liability Insurance, Employment Practices Liability Insurance, Fiduciary Liability Insurance Policy" ("AIG Policy") no. 02-477099-77 for the period of November 1, 2017 to November 1, 2019 to several entities named in the AIG Policy's Program Participant Endorsements, including PWC Holding in Endorsement no. 39.  (Pl. SUF Nos. 26-27; Def. SUF Nos. 30-32; Pl. SSUF No. 1.)  Endorsement no. 39 listed PWC Holding as a California corporation located in Lake Forest, California and identified PWC Holding as a Named Entity and its Insured Representative was listed as LLCP.  (Pl. SUF Nos. 29-30; Def. SUF Nos. 33, 36.)  Pacific World was an insured Company under the AIG Policy as a Subsidiary of PWC Holding and Pacific World's board members were Insured Persons in their capacities as board members.  (Def. SUF No. 34.)  LLCP, LLCP Entities, and their executives, were not Insureds under the AIG Policy.  (Pl. SUF No. 27.)

Pursuant to Endorsement no. 39, the AIG Policy had a $10 million per policy year limit of liability for the "Directors, Officers, and Private Company Liability Insurance" ("D&O Coverage Section") issued to PWC Holding.  (Pl. SUF No. 31; Def. SGI No. 31; Def. SUF No. 35.)  Endorsement no. 39 also had a $1 million "Side A Excess Limit of Liability" (hereinafter referred to as "Side A") that was the "excess aggregate limit of liability for all Non-

---

[3] The Court recites various terms from the insurance policies at issue in this action.  Where those terms have specific definitions in the respective insurance policy, the Court capitalizes the term, as done by the insurance policies.

Indemnifiable Loss solely for Executives of a Company" under the D&O

Coverage Section for PWC Holding.  (Def. SGI No. 32; Pl. SUF No. 32; Def

SUF No. 45.)  The excess $1 million coverage was available after the $10

million limit of liability coverage was exhausted "for all Non-Indemnifiable

Loss and all Loss incurred by an Executive that the Company fails or

refused to indemnify or advance to or on behalf of an Executive for any

reason, including Financial Insolvency, under this D&O Coverage Section."

(Ward Decl., Exh H at AIG00000208-209.)

Coverage A of the AIG Policy's D&O Coverage Section stated, in part:

"[t]his D&O Coverage Section shall pay the Loss of an Individual Insured

arising from a Claim made against such Individual Insured for any Wrongful

Act of such Individual Insured, except when and to the extent that the

Company has indemnified such Individual Insured."  (Pl. SUF No. 34.)  The

term Individual Insured included any Executive or Employee of a Company.

(Pl. SUF No. 35.)  The term Company included PWC Holding Corporation

and any subsidiary.  (Pl. SUF No. 36.)  The term Claim included "any civil,

criminal, administrative or regulatory proceeding or arbitration, mediation or

other dispute resolution proceeding for monetary or non-monetary or

injunctive relief which is commenced by . . . service of a complaint, motion,

writ or similar pleading or service of an order."  (Pl. SUF No. 37.)  The term

Wrongful Act was defined as "with respect to any Executive or Employee of

a Company, any actual or alleged act, breach of duty, neglect, error,

statement, misstatement, misleading statement, or omission by such

Executive or Employee in their respective capacities as such, or any matter

claimed against such Executive or Employee of a Company by reason of his

or her status as an Executive or Employee of a Company."  (Pl. SUF No. 38.)  The term Employee included "any past, present or future: (1) employee other than Executive of a Company, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including part-time, volunteer, seasonal and temporary employee."  (Ward. Decl., Exh. H at AIG00000163.)  The term Executive included "any past, present or future duly elected or appointed director, officer, board observer, trustee or governor, management committee member, member of the management board, supervisory board, advisory board or any other executive committee of a corporation, limited liability company, or joint venture, natural person general partner of a partnership, natural person limited partner, or equivalent position or any person found to have acted in such position under applicable law."  (Ward Decl., Exh. H at AIG00000163-164.)  The term Loss included "damages, judgments, [and] settlements" in addition to defense costs.  (Pl. SUF No. 39.)  The term Non-Indemnifiable Loss was defined as "Loss that is not Indemnifiable Loss."  (Def. SUF No. 46.)  The term Indemnifiable Loss meant "Loss for which a Company has indemnified or is permitted or required to indemnify an Individual Insured pursuant to the fullest extent permitted by the certificate of incorporation, charter, by-laws, articles of association, limited liability company agreement, partnership agreement, operating agreement or other organizational documents of a Company."  (Def. SUF No. 47; Pl. SGI No. 47; Def. Exh. 22 at AOE0705.)

The AIG Policy included a clause regarding Other Insurance which stated the AIG Policy "shall apply as primary insurance with respect to . . . any private equity or venture capital liability, general partner liability, or other

16

similar management or professional liability insurance maintained by any direct or indirect shareholder of the Named Entity including any liability policy maintained by the Insureds' Representative."  (Pl. SUF No. 40.)

The AIG Policy included express exclusions from its D&O Coverage Section (hereinafter "Exclusion 4(g)"), including the following: "the Insurer shall not be liable to make any payment for that portion of Loss in connection with that portion of any Claim made against an Insured: . . . (g) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an Individual Insured serving in any capacity, other than as an Executive, Employed Lawyer, Controlling Person or Employee of a Company, or as an Outside Entity Executive of an Outside Entity."  (Def. SUF No. 38; Pl. SGI No. 38; Def. Exh. 22 at AOE0741.)

### 3.    The Steadfast Policy

Steadfast Insurance Company ("Steadfast") issued a "Management and Professional Liability Insurance Policy" ("Steadfast Policy"), no. EOC 1067176 to LLCP for the period November 19, 2017 to November 19, 2019. (Pl. SUF No. 44.)  Under its "Management and Professional Liability Coverage" section, the Steadfast Policy stated it had a $10 million limit of liability for all Claims.  (Pl. SUF No. 45.)

The Steadfast Policy provided the following:

(A) The Insurer shall pay on behalf of each Insured Person, all Loss which an Insured Entity does not actually pay as indemnification to such Insured Person and which the Insured Person incurs on amount of any Claim first made against such Insured Person, individually or

17

United States District Court
Central District of California

otherwise, during the Policy Period or, if applicable, the Optional

Extension Period, for Wrongful Acts[; and]

(B) The Insurer shall pay on behalf of an Insured Entity, all Loss which

an Insured Entity actually pays, or agrees to pay, as indemnification

for, or on behalf of, each Insured Persons, which the Insured Persons

incurs on account of any Claim first made against such Insured,

individually or otherwise, during the Policy Period or, if applicable, the

Optional Extension Period, for Wrongful Acts.

(Pl. SUF No. 46.)  The term Insured meant each Insured Entity and the

Insured Persons.  (Pl. SUF No. 47.)  The term Insured Entity included the

LLCP Entities and PWC Holding.  (Pl. SUF No. 48; see also Def. SUF No.

21.)  The term Insured Persons included any director of an Insured Entity or

"any past, present or future natural person serving, or having served in an

Outside Capacity at the specific request or direction of an Insured."  (Pl.

SUF No. 49; see also Def. SUF No. 21.)  The term Outside Capacity

included "any past, present or future service by an Insured Person or other

natural person . . . serving or having served at an Insured's request as a

director, officer, general partner, managing partner, manager, managing

member, trustee, regent, governor, consultant, advisor, board observer,

member of the Board of Managers, members of the management board,

member of the supervisory board, or member of any board, operational,

management, oversight or committee role of position, of any Outside Entity."

(Pl. SUF No. 50.)  The term Outside Entity meant "any Portfolio Company,"

including Pacific World.  (Pl. SUF No. 51.)  The term Claim was defined as a

civil proceeding commenced by the filing or service of a complaint against

an Insured.  (Pl. SUF No. 52.)

The Steadfast Policy, under the heading "Service in Connection with Outside Entities," stated "this Policy shall be specifically excess of: (a) any amounts actually paid to such Insured Person under any other valid and collectible insurance maintained by the applicable Outside Entity covering such Insured Person for his or her service in such Outside Capacity; and (b) any amounts actually paid to such Insured Person under any valid and collectible indemnification from the applicable Outside Entity."  (Pl. SUF No. 53.)   The Steadfast Policy also stated, "if Loss from such Claim is not paid to, or on behalf of, an Insured Person by such valid and collectible insurance" for any reason, "then this Policy will respond on behalf of the Insured Person as if it were primary" but "without prejudice to the Insurer's excess position."  (Pl. SUF No. 54.)  The Steadfast Policy included a subrogation provision, as follows: "[i]n the event of any payment under this Policy, the Insurer shall be subrogated to all of the potential or actual rights of recovery of the Insured up to the amount of the applicable paid loss."  (Pl. SUF No. 55.)

### 4.    The XL Policy

Plaintiff XL Specialty Insurance Company issued an Excess Insurance Policy ("the XL Policy"), no. ELU153018-18 to LLCP for the period November 19, 2017 to November 19, 2018.  (Pl. SUF No. 56.)  The XL Policy had a $10 million limit of liability and applied in excess of the Steadfast Policy, i.e., only after the Steadfast Policy was exhausted by actual payment of covered amounts by Steadfast was the XL Policy

triggered.  (Pl. SUF No. 57; Def. SSUF No. 17.)  In the event of the

exhaustion of coverage under the Steadfast Policy, the XL Policy would

apply in conformance with the Steadfast Policy's terms, conditions,

endorsements and warranties, including its other insurance and subrogation

clauses.  (Pl. SUF No. 58.)

### 5.      Pacific World's By-Laws

Pacific World's By-Laws included an indemnification provision at

Section 3.14.  (See Def. Exh. 15 at AOE0478-0485.)  Section 3.14(b)

stated:

> This corporation shall indemnify any person who was or is a party, or
> is threatened to be made a party, to any proceeding (other than an
> action by or in the right of this corporation to procure a judgment in its
> favor) by reason of the fact that such person is or was an agent of this
> corporation, against expenses, judgments, fines, settlements and
> other amounts actually and reasonably incurred in connection with
> such a proceeding if such person acted in good faith and in a matter
> such person reasonably believed to be in the best interests of this
> corporation and, in the case of a criminal proceeding, had no
> reasonable cause to believe the conduct of such person was
> unlawful.  The termination of any proceeding by judgment, order,
> settlement, conviction, or upon a plea of nolo contendere or its
> equivalent shall not, of itself, create a presumption that the person did
> not act in good faith and in a matter which the person reasonably
> believed to be in the best interests of this corporation or that the

person had reasonable cause to believe that the person's conduct

was unlawful.

(Def. Exh. 15 at AOE0478-0479; <u>see</u> <u>also</u> Def. SUF Nos. 48-49; Pl. SGI

Nos. 48-49.)

### 6. Coverage for the Underlying Lawsuits and Advancement Actions

In correspondence dated October 30, 2018, Steadfast acknowledged potential coverage for the Underlying Lawsuits under the Steadfast Policy and advised that the LLCP Entities were Insured Entities and the Director Defendants were Insured Persons under the Steadfast Policy. (Pl. SUF Nos. 59-60; Def. SUF Nos. 18, 24.)

Pacific World gave notice of the Underlying Lawsuits to Defendant in October 2018. (Pl. SUF No. 61.) Alex Fooksman ("Fooksman") was Defendant's claims handler for the Underlying Lawsuits and he maintained notes regarding Pacific World's claim. (Pl. SUF Nos. 62-63.) On January 7, 2019, Defendant issued Pacific World a coverage letter for the Underlying Lawsuits. (Pl. SUF No. 64.) In its correspondence, Defendant acknowledged potential coverage for the Director Defendants in their capacities as former directors of Pacific World. (Pl. SUF No. 65; Def. SGI No. 65.) On July 10, 2019, Defendant issued a supplemental coverage letter. (Pl. SUF No. 66.). The letter stated defense counsel in the Underlying Lawsuits had informed Defendant AIG's counsel that Pacific World was not indemnifying the Director Defendants and the Director Defendants and LLCP Entities presented a joint defense to the Underlying

Lawsuits and were represented by the same counsel.  (Pl. SUF Nos. 67-68; Def. SGI No. 67.)

Defendant initially paid 80% of the joint defense costs for the Underlying Lawsuits.  (Pl. SUF No. 69; Def. SGI No. 69; Def. SUF No. 40.) Defendant became aware of the Steadfast Policy in July 2019 and soon thereafter reached an agreement with Steadfast that Steadfast would contribute 45% of the defense costs for the Underlying Lawsuits.  (Def. SUF No. 41; see also Pl. SUF Nos. 70-72; Def. SGI Nos. 70-72; Def. SSUF No. 43; Pl. SSUF No. 5.)  Plaintiff did not participate in the negotiations between Steadfast and Defendant.  (Def. SUF No. 50.)

On May 1, 2019, Fooksman entered a claim note that he was "[i]nformed by insured, defense counsel, and broker in writing that the individual defendants PWC directors are not being indemnified by PWC.  As such, this became a Side A issue and I issued a check for the retention of $50,000 as a reimbursement."  (Pl. SUF No. 75.)  Fooksman testified at his deposition that when he wrote "this became a Side A issue," he was referring to Coverage A of the AIG Policy's D&O Coverage Section.  (Pl. SUF No. 76; Def. SGI No. 76.)

The Underlying Lawsuits were mediated in January 2020.  (Pl. SUF No. 79.)  Following the mediation, the parties to the Underlying Lawsuits and Advancement Actions entered into a global settlement that resolved all of the legal claims alleged in the Underlying Lawsuits.  (Pl. SUF Nos. 80, 82.)  None of the parties admitted liability.  (Pl. SUF No. 81.)

Before the mediation, Defendant had paid $7,263,948.90 and Steadfast had paid $2,988,596.98 in defense costs for the Underlying

Lawsuits. (Pl. SUF Nos. 77-78.) Following the mediation and pursuant to the settlement agreement: Steadfast paid the balance of the Steadfast Policy limit ($7,011,403.02), thereby exhausting the Steadfast Policy; and Defendant paid the balance of the AIG Policy's D&O Coverage Section limit under Endorsement no. 39 ($2,736,051.10), thereafter declaring the AIG Policy exhausted. (Pl. SUF Nos. 83-84, 86.) Defendant did not contribute its $1 million Side A coverage under the AIG Policy to the defense costs or settlement of the Underlying Lawsuits. (Pl. SUF No. 85.)

Plaintiff issued a coverage letter on January 13, 2020, which stated in part, "Pursuant to Pacific World's ByLaws, its Note Purchase Agreement with LLCP IV, and the Management Agreement between Pacific World and LLCP, Pacific World is obligated to advance defense expenses and indemnify the Insureds in connection with the . . . Actions" but Pacific World refused to do so. (Def. SUF No. 28; see also Def. Exh. 11 at AOE0399-401.) Plaintiff acknowledged potential coverage for the Underlying Lawsuits under the XL Policy. (Def. SUF No. 18; Pl. SGI No. 18.)

Plaintiff paid $1,252,545.88 to complete the funding of the settlement of the Underlying Lawsuits and Advancement Actions and reserved its right to seek reimbursement from Defendant. (Pl. SUF Nos. 87-88; Def. SSUF No. 17.)

Following the settlement of the Underlying Lawsuits and Advancement Actions, Defendant did not pay for any defense costs after January 2020. (Pl. SUF No. 89; Def. SGI No. 89.) Plaintiff has paid those costs in the amount of $870,157.68. (Pl. SUF No. 90; Def. SGI No. 90.) In addition, Plaintiff has paid for Steadfast's share of the defense costs since

23

January 2020 in the amount of $1,076,834.10, because the Steadfast Policy was exhausted by the settlement.  (Pl. SUF No. 91.)  In total, Plaintiff has paid $3,199,537.44 toward the defense and settlement of the Underlying Lawsuits and Advancement Actions.  (Pl. SUF No. 92.)

Plaintiff and Defendant participated in a non-binding mediation on June 23, 2020 pursuant to the AIG Policy's Dispute Resolution Process provision, but the parties were not able to resolve their disputes.  (Pl. SUF No. 93.)

**B.    Disputed Facts**

The parties dispute whether Defendant's agreement with Steadfast to pay 55% of the defense costs for the Underlying Lawsuits extended to the AIG Policy's Side A coverage.  Defendant presents evidence that it had no agreement with Steadfast or Plaintiff regarding Defendant's contribution of its Side A coverage to defense or settlement.  (Def. SUF No. 51.)  Plaintiff presents evidence to suggest Defendant's agreement with Steadfast to contribute 55% of the defense costs in the Underlying Lawsuits was not limited only to the D&O Coverage Section of the AIG Policy.  (Pl. SGI No. 51; Pl. SUF No. 70.)

The parties also dispute whether Defendant was responsible for providing the primary insurance coverage for the Director Defendants in the Underlying Lawsuits.  Plaintiff presents evidence that Defendant was required to provide primary coverage for the Director Defendants pursuant to the express terms of the AIG Policy.  (Pl. SUF Nos. 40, 69.)  Defendant presents evidence that the AIG Policy did not provide primary coverage for

United States District Court
Central District of California

the Director Defendants directly or in their capacity as LLCP executives. (Def. SGI No. 69.)  Defendant does not dispute, however, that the AIG Policy stated it applied as primary insurance under certain circumstances. (Def. SGI No. 40 (not disputing Plaintiff's SUF No. 40 quoting language about "Other Insurance" set forth in the AIG Policy).)

Finally, the parties dispute who was responsible for paying the remaining balance of the settlement amount for the Underlying Lawsuits and Advancement Actions and the defense costs after the Steadfast Policy's $10 million limit was reached and the AIG Policy's D&O Coverage Section's $10 million limit was reached.  Plaintiff presents evidence that it paid the outstanding balance owed on the settlement and for defense costs because Defendant refused to pay its $1 million Side A coverage.  (Pl. SUF No. 87.) Defendant presents evidence that Plaintiff was obligated to pay this amount based on Plaintiff's own obligations under the Steadfast Policy and the XL Policy to provide excess coverage.  (Def. SUF No. 87.)

## V.    DISCUSSION

### A.    Plaintiff's Motion

Plaintiff moves the Court to enter summary judgment as to its claim for subrogation.  Plaintiff argues the AIG Policy provided primary coverage for the Director Defendants for the Underlying Lawsuits and Defendant breached the AIG Policy by refusing to pay the $1 million Side A coverage. Specifically, Plaintiff contends: the Underlying Lawsuits were Side A claims; the Side A coverage applied to the Underlying Lawsuits; the Underlying Lawsuits alleged wrongful acts committed by the Director Defendants in

their capacity as Pacific World directors and sought damages which constituted a loss under the AIG Policy; the AIG Policy required Defendant to pay 100% of the defense costs of the Director Defendants and the settlement amount incurred jointly with the LLCP Entities; and Defendant's breach of the AIG Policy caused Plaintiff to pay $1 million wrongfully because Defendant was required to pay the full limit of the Side A coverage.

In Opposition, Defendant argues Plaintiff's Motion should be denied for several reasons.  First, Plaintiff has not established that Plaintiff was not primarily liable for the $1 million payment, for which it seeks subrogation from Defendant, and that Defendant was primarily liable.  According to Defendant, Plaintiff was primarily liable for the defense costs of its own insureds and the insurance coverage under the XL Policy was not in excess to the AIG Policy.  Second, Defendant was not liable for the $1 million Side A coverage, based on the express language of Endorsement no. 39.  Specifically, it contends Plaintiff has not shown a non-indemnifiable loss or non-indemnifiable loss solely for an executive, as required by Endorsement no. 39.  Defendant also contends Exclusion 4(g) in the AIG Policy precluded Side A coverage.  Third, Defendant argues Plaintiff cannot show justice requires the entire $1 million amount of the Side A coverage should be shifted to Defendant.

The Court addresses these arguments in turn.  Before turning to the parties' arguments, however, the Court notes it is undisputed that the settlement of the claims alleged in the Underlying Lawsuits was not apportioned among the named defendants and most of the defendants were represented by the same counsel without apportionment of the fees as to

26

each defendant.  Moreover, the Underlying Lawsuits named several entities and individual persons as defendants.  Based on these undisputed facts, it cannot be determined exactly what portion of the defense and settlement costs were attributed to the Director Defendants.[4]  In any event, the focus of this action for subrogation is limited only to the Director Defendants and which entities were responsible for providing insurance coverage for their defense to the Underlying Lawsuits.  To the extent the parties raise arguments exceeding the limited scope of Plaintiff's subrogation claims, the Court will not address them.[5]

### 1.    Plaintiff's Subrogation Claims

As another preliminary matter, the Court points out Plaintiff's Complaint alleges three claims, for contractual subrogation, equitable subrogation, and declaratory judgment, yet Plaintiff's Motion only addresses Plaintiff's claim for "subrogation."  "Subrogation is defined as the substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim."  Fireman's Fund Ins. Co. v. Maryland Cas. Co., 65 Cal. App. 4th 1279, 1291 (1998).  "In the insurance context, subrogation takes the form of an insurer's right to be put in the position of the insured for a loss that the insurer has both insured and paid."

_____

[4] This supports the agreement between Defendant and Steadfast to split the defense costs 55/45, which Fooksman testified during his deposition was an allocation that "wasn't [based on] science."  (See Pl. SUF No. 72; Def. SGI No. 72.)

[5] The parties' arguments about whether the AIG Policy or the XL Policy provided coverage for 100% of the Director Defendants' defense costs fall outside the scope of the Court's analysis here.

27

State Farm Gen. Ins. Co. v. Wells Fargo Bank, N.A., 143 Cal. App. 4th 1098, 1106 (2006) (quotation marks and citations omitted); see also Interstate Fire & Casualty Ins. Co. v. Cleveland Wrecking Co., 182 Cal. App. 4th 23, 32 (2010) ("The subrogated insurer is said to stand in the shoes of its insured, because it has no greater rights than the insured[.]  Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have.") (internal quotation marks omitted); Sampo Japan Ins. Co. of Am. v. Action Exp., LLC, 19 F. Supp. 3d 954, 957-58 (C.D. Cal. 2014).  An insurer, in its role as subrogee, has no greater rights than those possessed by its insured, and its claims are subject to the same defenses.  See Liberty Mut. Ins. Co. v. Fales, 8 Cal. 3d 712, 717 (1973); W. Heritage Ins. Co. v. Frances Todd, Inc., 33 Cal. App. 5th 976, 984 (2019) ("The right of subrogation is purely derivative.  An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured.") (internal quotation marks omitted).

Here, Plaintiff stands in the shoes of the Director Defendants and, as alleged in the Complaint, pursues their claim to coverage under Side A of the AIG Policy.  At the hearing, Defendant argued Plaintiff stands in the shoes of all of its insureds, including LLCP and the LLCP Entities.  For purposes of this action, however, Plaintiff stands in the shoes of the Director Defendants only, as only they have a claim to coverage under the AIG Policy.

Plaintiff's contractual and equitable subrogation claims, as alleged, appear to be distinct.  Contractual subrogation rights "arise from an express

or implied agreement between the subrogor and subrogee."  In re Hamada, 291 F.3d 645, 649 (9th Cir. 2002).  In contrast, "[e]quitable subrogation is a legal fiction, which permits a party who satisfies another's obligation to recover from the party 'primarily liable' for the extinguished obligation."  Id. (quoting In re Air Crash Disaster, 86 F.3d 498, 549 (6th Cir. 1996)) (internal quotation marks omitted); see Pulte Home Corp. v. CBR Electric, Inc., 50 Cal. App. 5th 216, 228 (2020) ("A general liability insurer that has paid a claim to a third party on behalf of its insured . . . may have an equitable right of subrogation against: . . . other parties who are legally liable to the insured for the harm suffered by the third party (such as by an indemnification agreement) under a contractual indemnity theory.'") (emphasis in original) (quoting Interstate Fire & Cas. Ins. Co., 182 Cal. App. 4th at 32).  Equitable subrogation is a "'creature of equity' and 'is enforced solely for the purpose of accomplishing the ends of substantial justice.'"  In re Hamada, 291 F.3d at 649 (quoting Memphis & L.R.R. Co. v. Dow, 120 U.S. 287, 302 (1887)); see also Transcon. Ins. Co. v. Ins. Co. of Penn., 148 Cal. App. 4th 1296, 1303 (2007).  "The aim of equitable subrogation is to place the burden for a loss on the party ultimately liable or responsible for it and by whom it should have been discharged, and to relieve entirely the insurer or surety who indemnified the loss and who in equity was not primarily liable therefor."  Fireman's Fund Ins. Co., 65 Cal. App. 4th at 1296 (citations omitted).

Although Plaintiff's subrogation claims appear to be distinct, the Court analyzes them under California's equitable subrogation standard, see Fireman's Fund Ins. Co., 65 Cal. App. 4th at 1291-92, which both Plaintiff and Defendant have done in their papers.

Insurance subrogation is governed by state law.  See In re Hamada, 291 F.3d at 651; see also Mort v. United States, 86 F.3d 890, 893 (9th Cir. 1996).  The Court has diversity jurisdiction here, 28 U.S.C. § 1332, so it applies California substantive law.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938); see also Berkeley Regional Ins. Co. v. Capitol Specialty Ins. Co., No. CV 20-6622 FMO (Ex), 2021 WL 1321650, at *2, n.2 (C.D. Cal. Mar. 3, 2021).

The elements of an insurer's claim for subrogation are: (1) "the insured suffered a loss for which the defendant is liable either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer;" (2) "the claimed loss was one for which the insurer was not primarily liable;" (3) "the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable;" (4) "the insurer has paid the claim of its insured to protect its own interest and not as a volunteer;" (5) "the insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer;" (6) "the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends;" (7) "justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer;" and (8) "the insurer's damages are in a liquidated sum, generally the amount paid to the insured."  Fireman's Fund Ins. Co., 65 Cal. App. 4th at 1292 (citations omitted); see also W. Heritage Ins. Co., 33 Cal. App. 5th at 984; Pulte Home Corp., 50 Cal. App. 5th at 229.

United States District Court
Central District of California

United States District Court
Central District of California

1    Although Plaintiff does not organize the Motion or its evidence

2  according to the foregoing eight element of its subrogation claims,

3  Defendant only opposes Plaintiff's Motion on the grounds that Plaintiff

4  cannot meet its burden as to elements 2 and 7.  (See Opp'n; see also Reply

5  at 2 (noting Defendant did "not dispute that six of the eight elements of

6  subrogation . . . are established").)  Hence, the Court limits its analysis to

7  these two elements.

8

9         **2.     Subrogation Element 2: Whether the Claimed Loss was**

10             **One for Which the Insurer was not Liable Primarily**

11    The Court considers whether Plaintiff has met its burden to show it

12  was not liable primarily to its insureds, the Director Defendants, for the $1

13  million Plaintiff seeks to recover from Defendant.

14    Plaintiff presents evidence to show the AIG Policy provided the

15  primary insurance coverage for the Director Defendants with respect to the

16  Underlying Lawsuits, as opposed to the Steadfast and XL Policies.  Namely,

17  Plaintiff points to the AIG Policy's express language that stated it "shall

18  apply as primary insurance with respect to . . . any private equity or venture

19  capital liability, general partner liability, or other similar management or

20  professional liability insurance maintained by any direct or indirect

21  shareholder of [PWC Holding] including any liability policy maintained by

22  [LLCP]."  (Pl. SUF No. 40.)  According to Plaintiff, the Director Defendants

23  were "Individual Insureds" under the AIG Policy because they were former

24  "Executives" of Pacific World.  (Pl. SUF Nos. 34, 65.)  Plaintiff argues the

25  Underlying Lawsuits presented "Claims" covered under the AIG Policy

26

United States District Court
Central District of California

because the Underlying Lawsuits alleged claims against the Director

Defendants for their actions taken as board members of Pacific World for

"Wrongful Acts," as defined by the AIG Policy.  (Pl. SUF Nos. 10-12, 19, 38,

75.)  Specifically, Plaintiff contends the Underlying Lawsuits named the

Individual Defendants and brought claims against them in their capacities as

former board members of Pacific World and for their actions taken in that

capacity in 2014 to cause Pacific World to obtain the $215 million loan from

Prospect Capital and then distribute the funds.  (See Pl. SUF Nos. 10 (in the

lawsuit initiated by Pacific World, "the causes of action against each of the

Directors ar[o]se from their conduct as Board members of Pacific World."),

19 (in the lawsuit initiated by Prospect Capital, "the causes of action against

each of the Director Defendants arise from their conduct as Board members

of Pacific World.").)

Moreover, Plaintiff points to a provision in the Steadfast Policy that

stated the Steadfast Policy applied as excess insurance over any coverage

maintained by an outside entity, such as PWC Holding or Pacific World.  (Pl.

SUF No. 53.)  Based on this provision in the Steadfast Policy and the

provision discussed supra in the AIG Policy indicating it provided primary

coverage to its insured for specific claims, Plaintiff argues the Steadfast

Policy applied in excess to the AIG Policy and the XL Policy followed in

excess to the Steadfast Policy.

Plaintiff also contends because Pacific World refused to indemnify the

Individual Defendants, coverage under the AIG Policy's Side A was

triggered by its express terms, i.e., coverage for  "all Non-Indemnifiable

Loss and all Loss incurred by an Executive that the Company fails or

1  refuses to indemnify or advance to or on behalf of an Executive for any

2  reason . . . under this D&O Coverage Section."  (Pl. SUF No. 33; Ward

3  Decl., Exh. H at AIG00000208-209.)  In addition, Plaintiff argues the Side A

4  coverage applied because it was available "solely for the Executives of a

5  Company," including Director Defendants, as opposed to Coverage A of the

6  AIG Policy, which covered a broader category of any "Loss of an Individual

7  Insured," including employees and executives of Pacific World.  (Pl. SUF

8  Nos. 32, 34-35; Def. Exh. H at AIG00000311.)

9      In Opposition, Defendant contends Plaintiff was the sole insurer for

10  the LLCP Entities and Director Defendants in their capacities as LLCP

11  executives, Plaintiff had an independent and complete obligation to cover

12  the claims of its insureds, and Plaintiff was primarily liable for those claims.

13  Defendant cites three cases to show when two insurance companies each

14  have an equal obligation to provide a party's defense or settlement, neither

15  is "primarily liable" over the other.  (See Opp'n at 15-17 (discussing Am.

16  States Ins. Co. v. Nat'l Fire Ins. Co. of Hartford, 202 Cal. App. 4th 692

17  (2011), Carter v. Pulte Home Corp., 52 Cal. App. 5th 571 (2020), and

18  Maryland Cas. Co. v. Nationwide Mut. Ins. Co., 81 Cal. App. 4th 1082

19  (2000).)  According to the AIG Policy's Exclusion 4(g), Defendant argues the

20  AIG Policy did not cover claims as to the LLCP Entities or the Director

21  Defendants in their capacities as LLCP executives.  Defendant contends the

22  defense costs Plaintiff paid were "jointly incurred together by the LLCP

23  Entities and the [Director] Defendants, who were all jointly represented by

24  Quinn Emmanuel in connection with the Underlying Actions."  (Opp'n at 17.)

25

26
                                    33

United States District Court
Central District of California

United States District Court
Central District of California

**a.      Whether the AIG Policy Applied to the Costs Incurred by the Director Defendants in the Underlying Lawsuits**

As an initial threshold matter, the Court considers the claims alleged in the Underlying Actions to determine whether Plaintiff has met its burden to show the AIG Policy, namely the D&O Coverage Section and Side A coverage, applied to the costs incurred by the Director Defendants in connection with the Underlying Actions.  See Nordstrom Inc. v. Chubb & Son, 54 F.3d 1424, 1433 (9th Cir. 1995) ("In determining whether Nordstrom faced any independent nonconcurrent liability, we may only consider the claims actually settled, which are defined by the allegations in the complaint.").

As discussed supra, the operative complaint in the Prospect Capital action alleged claims against the Director Defendants (defined in the complaint as Arthur Levine, Lauren Leichtman, Kimberly Pollack, Steven Hartman, and James Colleran, the same as in this Order) and stated the claims "ar[o]se from their conduct as Board members of Pacific World, a California corporation."  (Def. Exh. 18 at ¶ 28; Pl. SUF No. 19.)  The operative complaint in the Pacific World action contained the same statement.  (Def. Exh. 19 at ¶ 22; Pl. SUF No. 10.)  Both the Underlying Lawsuits also alleged the Director Defendants were directors of Pacific World and executives of LLPC, except James Colleran, who was Pacific World's Chief Executive Officer, a member of the Pacific World board, and not affiliated with LLPC.  (See Def. Exh. 18 at ¶¶ 18-22; Def. Exh. 19 at ¶¶ 16-20.)

United States District Court
Central District of California

The Pacific World action brought claims against the Director Defendants for unlawful distribution (count 1) and breach of fiduciary duty (count 2).  (Def. Exh. 19.)  The Prospect Capital action brought claims against the Director Defendants for aiding and abetting fraudulent transfer (count V) and civil conspiracy to commit fraudulent transfer (count VI).  (Def. Exh. 18.)  Both actions alleged the Director Defendants engaged in wrongdoing as Pacific World board members in connection with the 2014 loan transaction and distributions of the proceeds, by virtue of their positions at LLPC which caused them to have a financial interest in the distributions that were made from the loan proceeds.  (See Def. Exh. 18 ¶¶ 166-167, 172; Def. Exh. 19 ¶¶ 122, 126.)  For example, as alleged in the Prospect Capital Complaint, the Director Defendants knew Pacific World's financial outlook was poor, yet they caused Pacific World to obtain a loan they knew Pacific World would be unable to repay.  (Def. Exh. 18 at ¶¶ 166-167, 172.)  Prospect Capital alleged the Director Defendants acted to benefit LLCP and orchestrated the loan for LLCP's benefit and to Prospect Capital's detriment.  (Id.)  The Pacific World Complaint set forth similar allegations.  (Def. Exh. 19 ¶¶ 122, 126.)

The allegations in the Underlying Lawsuits support Plaintiff's contention that the Underlying Lawsuits named the Director Defendants in their capacities as Pacific World executives and not as LLCP executives.  The Court acknowledges the complaints filed in the Underlying Lawsuits identified the Director Defendants as parties and stated each of the Director Defendants, except James Colleran, was both a Pacific World executive and an LLCP executive.  The complaints also alleged the Director Defendants

35

United States District Court
Central District of California

1    were not disinterested in the 2014 loan transaction and distributions

2    because of their connection to LLCP.  The Pacific World and Prospect

3    Capital complaints, however, clearly and unambiguously stated the Director

4    Defendants were sued in their capacities as Pacific World executives only.

5    (See Def. Exh. 18, 19.)  Defendant points to Plaintiff's and Steadfast's claim

6    notes and coverage letters describing the claims against the Director

7    Defendants as proof that they were brought against the Director Defendants

8    in their capacities as LLCP executives as well.  (See Def. SUF Nos. 25, 27-

9    28.)  Those descriptions, however, are not relevant for purposes of the

10    Court's consideration of the scope of the claims alleged; the allegations in

11    the underlying complaints inform the Court's decision here.  See Nordstrom

12    Inc., 54 F.3d at 1433.  As Plaintiff points out, each claim alleged against the

13    Director Defendants in the Underlying Lawsuits necessarily relied on the

14    Director Defendants' status as Pacific World board members who approved

15    the 2014 loan from Prospect Capital and approved the three distributions at

16    issue.  The Director Defendants would not have had an opportunity to

17    approve the 2014 loan and three distributions therefrom but for their

18    positions as Pacific World board members.

19         Next, the Court interprets the language of the AIG Policy to determine

20    whether the claims alleged against the Director Defendants in the

21    Underlying Lawsuits fell under the scope of the AIG Policy's D&O Coverage

22    Section and Side A coverage.  "While insurance contracts have special

23    features, they are still contracts to which the ordinary rules of contract

24    interpretation apply," including giving "effect to the mutual intention of the

25    parties."  Terrell v. State Farm Gen. Ins. Co., 40 Cal. App. 5th 497, 503

26

(2019) (quoting <u>Bank of the West v. Sup. Ct.</u>, 2 Cal. 4th 1254, 1264 (1992))
(quotation marks omitted); <u>AIU Ins. Co. v. Sup. Ct.</u>, 51 Cal. 3d 807, 822
(1990).  "Insurance provisions should be interpreted in their 'ordinary and
popular sense' unless 'used by the parties in a technical sense, or unless a
special meaning is given to them by usage, in which case the latter must be
followed.'"  <u>Terrell</u>, 40 Cal. App. 5th at 503 (citations omitted).  "[W]hen the
terms of an insurance policy are clear and unambiguous, the interpretation
of the policy is an issue of law which may be resolved by summary
judgment."  <u>Rogers v. Prudential Ins. Co.</u>, 218 Cal. App. 3d 1132, 1137
(1990).  The contractual language governs interpretation of the insurance
contract if it is "clear and explicit, and does not involve an absurdity."  Cal.
Civ. Code § 1638.  A policy provision is ambiguous when it is capable of two
or more constructions, either of which is reasonable.  See <u>Powerline Oil Co.,
Inc. v. Sup. Ct.</u>, 37 Cal. 4th 377, 390 (2005); <u>Waller v. Truck Ins. Exch., Inc.</u>,
11 Cal. 4th 1, 18 (1995).

Having considered the relevant terms in the AIG Policy, the Court
does not find any to be ambiguous.  <u>Cf.</u> <u>Powerline Oil Co. Inc.</u>, 37 Cal. 4th
at 390.  In light of the AIG Policy's clear and unambiguous terms, the Court
interprets the AIG Policy's D&O Coverage Section to apply to the claims
alleged against the Director Defendants in the Underlying Lawsuits.  <u>See
Rogers</u>, 218 Cal. App. 3d at 1137.  In particular, the Director Defendants
were executives of Pacific World, so they qualified as "Individual Insured"
under the AIG Policy.  (<u>See</u> Ward Decl., Exh. H at AIG00000192,
AIG00000311; Pl. SUF No. 35.)  The claims alleged against the Director
Defendants fell under the AIG Policy's definition of "Claim" because they

United States District Court
Central District of California

were brought in a civil proceeding for monetary damages and the civil action was commenced by the filing and service of a complaint.  (See Ward Decl., Exh. H at AIG00000159-160; Pl. SUF No. 37.)  The claims alleged against the Director Defendants also fell under the AIG Policy's definition of "Wrongful Act" because they were brought against the Director Defendants "by reason of his or her status as an Executive or Employee of [Pacific World]," as discussed supra.[6]  (Ward Decl., Exh. H at AIG00000197-198; Pl. SUF No. 38.)  The Director Defendants suffered a "Loss" as defined by the AIG Policy because they incurred defense costs and were subject to a settlement for monetary damages paid to Pacific World and Prospect Capital.  (See Pl. SUF No. 39.)

Finally, the Court considers whether the $1 million Side A coverage applied upon the exhaustion of the $10 million D&O Coverage Section coverage.  Defendant argues the Side A coverage was not triggered because the defense and settlement costs incurred by the Director Defendants that exceeded the AIG Policy's D&O Coverage Section $10 million limit fell under the definition of "Indemnifiable Loss" under the Policy, which were not eligible for coverage under Endorsement no. 39.  As stated supra, "Indemnifiable Loss" covered all losses that were or should have been indemnified by a Company under the AIG Policy.  It is undisputed that, pursuant to Pacific World's own by-laws, Pacific World was required to

_____

[6] Moreover, although not raised by the parties, because Director Defendant James Colleran was not a LLCP executive, the claims alleged against him in his capacity as a Pacific World executive in the Underlying Lawsuits clearly fell only under the terms of the AIG Policy's D&O Coverage Section and the Side A coverage.

38

provide indemnification for the Director Defendants, but it refused.  The

Court agrees with Defendant that the loss at issue here would not qualify

under the AIG Policy's definition of "Non-Indemnifiable Loss."

The Court compares Endorsement no. 39, which states the Side A

coverage was available "for all Non-Indemnifiable Loss solely for Executives

of a Company (including Defense Costs) under the D&O Coverage Section,"

and the provision of the AIG Policy Plaintiff relies upon: clause 5 of the D&O

Coverage Section (hereinafter "clause 5"), which states the Side A coverage

is available "for all Non-Indemnifiable Loss and all Loss incurred by an

Executive that the Company fails or refuses to indemnify or advance to or

on behalf of an Executive for any reason . . . under this D&O Coverage

Section."  (See Def. SUF No. 45; Pl. SUF Nos. 32-33; Ward Decl., Exh. H at

AIG00000208-209.)

Although the exact language of clause 5 is not included in

Endorsement no. 39, clause 5 unambiguously states it was intended to

apply "in addition to the provisions of Clause 4 of the General Terms and

Conditions" and modify all program participant endorsement pages listed in

the AIG Policy.  (Ward Decl., Exh. H at AIG00000208.)  Applying the general

principles of contract interpretation here, the Court concludes clause 5 of

the D&O Coverage Section applied here despite its absence on the single

page of Endorsement no. 39.  Viewing the AIG Policy as a whole,

Endorsement no. 39 cannot be viewed reasonably as providing the entire

universe of applicable terms as it related to any of the insurance coverage

listed, including the Side A coverage.  To wit, Endorsement no. 39 included

several terms with specific definitions not set forth within the endorsement

page but found in other sections of the AIG Policy and was subject to several terms not listed expressly on the endorsement page.  Endorsement no. 39 simply provided a summary of the applicable terms.  Clause 5 of the D&O Coverage Section provided further elaboration on the applicable terms for the Side A coverage identified on Endorsement no. 39.  In light of the AIG Policy as a whole, including Endorsement no. 39 and the relevant terms set forth in the D&O Coverage Section of the AIG Policy including clause 5, the Court concludes Side A coverage was available for the Director Defendants if they incurred a "Loss" Pacific World failed or refused to indemnify.

Plaintiff has shown Side A coverage was available, for the following reasons.  The claims alleged against the Director Defendants in the Underlying Lawsuits were covered claims under the AIG Policy.  The Director Defendants were "Executives" of Pacific World, which was a covered "Company" as defined by the AIG Policy.  (Ward Decl., Exh. H at AIG00000163-164; Pl. SUF No. 36).  Pacific World refused to defend the Director Defendants in the Underlying Lawsuits, satisfying clause 5 of the AIG Policy's requirement that "all Loss incurred by an Executive that the Company fails or refuses to indemnify or advance to or on behalf of an Executive for any reason . . . under this D&O Coverage Section."  (Ward Decl., Exh. H at AIG00000208-209; Pl. SUF No. 33.)  Accordingly, the $1 million Side A coverage applied upon the exhaustion of the $10 million D&O Coverage Section.  See Rogers, 218 Cal. App. 3d at 1137.

Based on the foregoing, Plaintiff has shown the AIG Policy's D&O Coverage Section and Side A coverage applied to the defense and

United States District Court
Central District of California

United States District Court
Central District of California

settlement costs incurred by the Director Defendants in connection with the Underlying Litigations.  Defendant's own internal claim notes included a comment that Pacific World's failure to indemnify the Director Defendants in the Underlying Lawsuits was "a Side A issue."  (See Pl. SUF No. 75.)

The burden now shifts to Defendant to prove these costs were specifically excluded from the AIG Policy.  See Vardanyan v. AMCO Ins. Co. 243 Cal. App. 4th 779, 796 (2015) ("'When an issue of coverage exists, the burden is on the insured to prove facts establishing that the claimed loss falls within the coverage provided by the policy's insuring clause. [Citations.]  Once the insured has made that showing, the burden is on the insurer to prove the claim is specifically excluded.'") (quoting MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co., 187 Cal. App. 4th 766, 777 (2010)).

###### b.   Whether Exclusion 4(g) Precluded Coverage of the Costs Incurred by the Director Defendants Defending Against and Settling the Underlying Lawsuits

As mentioned supra, Defendant argues the Underlying Lawsuits brought claims against the Director Defendants in their capacities as executives of Pacific World and LLCP, which rendered the claims, and the Director Defendants' liability therefrom, not covered under the AIG Policy pursuant to Exclusion 4(g).  In addition, Defendant argues because the Director Defendants were also executives of LLCP, their dual affiliation rendered their actions excluded from coverage under the AIG Policy's Side A coverage.

United States District Court
Central District of California

1    As stated <u>supra</u>, Exclusion 4(g) stated: "the Insurer shall not be liable

2  to make any payment for that portion of Loss in connection with that portion

3  of any Claim made against an Insured: . . . (g) alleging, arising out of, based

4  upon or attributable to any actual or alleged act or omission of an Individual

5  Insured serving in any capacity, other than as an Executive, Employed

6  Lawyer, Controlling Person or Employee of a Company, or as an Outside

7  Entity Executive of an Outside Entity."  (Def. Exh. 22 at AOE0741.)

8    Under California law, "policy exclusions are strictly construed."

9  <u>E.M.M.I. Inc. v. Zurich Am. Ins. Co.</u>, 32 Cal. 4th 465, 471 (2004); <u>see</u> <u>also</u>

10  <u>Palp, Inc. v. Williamsburg Nat. Ins. Co.</u>, 200 Cal. App. 4th 282, 290 (2011)

11  ("An insurance policy's coverage provisions must be interpreted broadly to

12  afford the insured the greatest possible protection, while a policy's

13  exclusions must be interpreted narrowly against the insurer.") (citing

14  <u>MacKinnon v. Truck Ins. Exch</u>, 31 Cal. 4th 635, 648 (2003)).  "The

15  exclusionary clause must be conspicuous, plain and clear."  Id. (internal

16  quotation marks, emphasis, and citation omitted).  "This rule applies with

17  particular force when the coverage portion of the insurance policy would

18  lead an insurer to reasonably expect coverage for the claim purportedly

19  excluded."  <u>MacKinnon</u>, 31 Cal. 4th at 648.

20    In support of its arguments, Defendant cites several cases

21  interpreting exclusion provisions in insurance contracts to prohibit coverage.

22  (<u>See</u> Opp'n at 25-28.)  As to the cases Defendant relies upon that are non-

23  binding, out-of-Circuit, and do not interpret California law, the Court is not

24  persuaded to follow their reasoning and does not discuss them further.

25  The Court now turns to the California authority Defendant cites.  Defendant

26

cites to Acceptance Ins. Co. v. Syufy Enter., 69 Cal. App. 4th 321 (1999), for

the following proposition:

> California courts have consistently given a broad interpretation to the
> terms 'arising out of' or 'arising from' in various kinds of insurance
> provisions.  It is settled that this language does not import any
> particular standard of causation or theory of liability into an insurance
> policy.  Rather, it broadly links a factual situation with the event
> creating liability, and connotes only a minimal causal connection or
> incidental relationship.

Syufy, 69 Cal. App. 4th at 328.

In Syufy, a contractor, C&C, "contracted with Syufy to upgrade the

lighting and temperature controls at a theater owned by Syufy."  Syufy, 69

Cal. App. 4th at 324.  C&C had a general liability policy with insurer AIC,

which named Syufy as an additional insured with respect to any liability

arising out of C&C's work.  Id.  An employee of C&C sued after being injured

by a roof hatch at the theater; the employee alleged Syufy failed to maintain

a safe closing mechanism on the hatch and failed to warn about the

defective hatch.  Id.  AIC defended Syufy as an additional insured under its

policy, and eventually funded a settlement with the employee.  Id. at 325.

AIC then sued Syufy and its insurer, Reliance, for declaratory relief,

indemnification, and equitable contribution.  AIC asserted that the

employee's injury did not arise out of C&C's work, and therefore Syufy was

not an additional insured under the AIC policy.  Id.  Following a summary

judgment in favor of Reliance, AIC appealed.

1    The appellate court affirmed.  C&C's insurance policy with AIC

2 included an additional insured provision providing that Syufy was an

3 additional insured under the policy, "'but only with respect to liability arising

4 out of "your work" for that insured by or for you.'  The policy specified that

5 'you' and 'your' referred to C&C, the named insured."  Id. at 324.  AIC

6 argued in part that Syufy was not an additional insured under the

7 circumstances, because the employee was injured as he "was leaving the

8 job site, through a roof hatch on which C&C performed no work, and which

9 injured him solely because of Syufy's negligent maintenance."  Id. at 326.

10 AIC asserted that "its additional insured endorsement would not apply to

11 Syufy's liability for [the employee's] injury under California case law

12 interpreting the policy term 'arising out of,'" because the employee's injury

13 "was attributable solely to Syufy's negligent maintenance of the roof hatch."

14 Id. at 327.

15    The Court of Appeal rejected this contention, noting, as quoted above,

16 courts' broad interpretation of the phrase "'arising out of.'"  Id. at 328.  The

17 court found the employee's injury "clearly 'arose out of' the work he was

18 performing on the roof of Syufy's building.  The relationship between the

19 defective hatch and the job was more than incidental, in that [the employee]

20 could not have done the job without passing through the hatch.  The fact

21 that the defect was attributable to Syufy's negligence is irrelevant, since the

22 policy language does not purport to allocate coverage according to fault."

23 Id. at 328-329.  The court stated that when an insurer "grants coverage for

24 liability 'arising out of' the named insured's work, the additional insured is

25

26

United States District Court
Central District of California

covered without regard to whether injury was caused by the named insured or the additional insured."  Id. at 330.

The Court finds the Syufy decision instructive but distinguishable as applied to the facts presented in this case for two reasons.  First, the Syufy court's interpretation of the "arising out of" language in the applicable insurance policy was in favor of the insured, not in favor of the insurer.  In other words, the court construed the term broadly to find coverage for the claimed loss.  Second, Syufy did not interpret a policy exclusion, which must be construed narrowly under California law.  See E.M.M.I. Inc., 32 Cal. 4th at 471; MacKinnon, 31 Cal. 4th at 648.

Defendant also relies on Medill v. Westport Ins. Co., 143 Cal. App. 4th 819 (2006).  The insurance policy at issue in Medill excluded from the definition of "loss" any damages "arising out of" a violation of securities law "or any insured's issuance or endorsement of stocks, bonds, securities, annuities, or other financial instruments."  Medill, 143 Cal. App. 4th at 832 (internal quotation marks omitted).  The court concluded the policy's exclusion of coverage in the event any insured engaged in the excluded activity applied because, although the directors and officers did not engage in the excluded activity, other insureds did.  Id.

The Court does not find Medill persuasive because, here, the AIG Policy's Exclusion 4(g) did not exclude from coverage all otherwise covered claims if any insured engaged in excludable conduct, unlike in Medill.  Even if it did, Defendant does not present evidence to show any insured engaged in excludable conduct to trigger Exclusion 4(g) except to argue the Underlying Lawsuits brought claims against the Director Defendants in their

United States District Court
Central District of California

capacities as LLCP executives.  The Court has rejected this argument, supra, and does so again here.

Construing Exclusion 4(g) as broadly as Defendant suggests would require the Court to re-write the language of the exclusion.  Cf. Rosen v. State Farm Gen. Ins. Co., 30 Cal. 4th 1070, 1073 (2003) ("[W]e do not rewrite any provision of a contract, . . . for any purpose.").  The Court declines Defendant's invitation.  If Defendant intended to exclude from the AIG Policy's D&O Coverage Section any liability for actions taken by any employee or executive of Pacific World who was sued in their capacity as a Pacific World employee or executive, then Defendant could have included a term in the AIG Policy providing such an exclusion.  As written, Exclusion 4(g) does not provide such an exclusion.  Likewise, contrary to Defendant's argument, the AIG Policy did not exclude from coverage all actions taken by a Pacific World executive who was also an executive of another non-covered company, nor did the Side A coverage include a statement that such coverage was only available for an executive who was not also an executive of another company.  The AIG Policy could have been drafted to contain such exclusions, but it was not.

Construing Exclusion 4(g) narrowly, the Court concludes the claims alleged against the Director Defendants in the Underlying Lawsuits did not "arise out of" excluded activity under Exclusion 4(g) because they were alleged against the Director Defendants in their capacities as Pacific World executives only, as discussed at length supra.  In other words, the allegations in the Underlying Lawsuits did not state the Director Defendants were "serving in any capacity, other than as an [e]xecutive" of Pacific World

46

United States District Court
Central District of California

1   when they approved the 2014 loan or 3 distributions, nor did the claims

2   "arise out of" the Director Defendants operating as LLCP executives when

3   they did so.  (Def. Exh. 22 at AOE0741.)  As such, the Underlying Lawsuits

4   did not allege the Director Defendants engaged in excludable conduct, nor

5   that the Director Defendants' liability "arose out of" their engagement in

6   excluded activity under Exclusion 4(g).

7          Even if the conduct Director Defendants allegedly engaged in that

8   gave rise to the Underlying Lawsuits was in their capacity as LLCP

9   executives as well as in their capacity as Pacific World executives, the Court

10  does not construe Exclusion 4(g) as excluding coverage under the AIG

11  Policy's D&O Coverage Section or Side A here.  The language of Exclusion

12  4(g) does not address when liability arises from actions taken by covered

13  executives in a covered and non-covered capacity.  To the extent this

14  creates an ambiguity, "[a]ny ambiguous terms are resolved in the insureds'

15  favor, consistent with the insureds' reasonable expectations."  Safeco Ins.

16  Co. v. Robert S., 26 Cal. 4th 758, 763 (2001).  The Court construes

17  Exclusion 4(g) narrowly and in favor of coverage under the AIG Policy,

18  including the D&O Coverage section and Side A, for the Director

19  Defendants.[7]

20         The Court concludes the AIG Policy's Exclusion 4(g) did not apply to

21  the Underlying Lawsuits and Defendant has failed to meet its burden to

22  _____

23  [7] In any event, Defendant seems to overlook the undisputed fact that
    James Colleran was a Director Defendant who had no affiliation with
24  LLCP, was sued only in his capacity as an executive of Pacific World, and
    all of his actions were taken in that capacity.  As applied to him, Defendant
25  cannot, and has not, argued the full limits of the AIG Policy's D&O
    Coverage Section and Side A coverage was not available.

26

47

show Exclusion 4(g) prohibited the D&O Coverage Section and Side A coverage under the AIG Policy.

### c.   Whether the XL Policy or the AIG Policy Provided Primary Coverage

The Court now returns to whether Plaintiff has met its burden to demonstrate the second element of its subrogation claims, i.e., that the AIG Policy provided the primary coverage for the Director Defendants as to the Underlying Lawsuits.  As stated supra, the AIG Policy contained an "Other Insurance" provision that explained the AIG Policy "shall apply as primary insurance with respect to any "management or professional liability insurance maintained by any direct or indirect shareholder of [PWC Holding Corporation] including any liability policy maintained by [LLCP]."  (Ward Decl., Exh H at AIG00000181.)  Defendant's own description of its policy as primary in relation to other policies maintained by PWC Holding Corporation and LLCP is entitled to deference, given this clear and unambiguous term in the AIG Policy.  See Pub. Serv. Mut. Ins. Co. v. Liberty Surplus Ins. Co., 205 F. Supp. 3d 1161, 1170-71 (E.D. Cal. Aug. 25, 2016); see also Terrell, 40 Cal. App. 5th at 503.  Courts generally enforce the terms of insurance policies pertaining to allocation issues and the characterization of its own policy as "primary" or "excess."  See Maryland Cas. Co., 81 Cal. App. 4th at 1090.  Here, Defendant's characterization of the AIG Policy as primary is determinative of the issue.  See Residence Mut. Ins. Co. v. Travelers Indem. Co., 26 F. Supp. 3d 965, 974 (C.D. Cal. 2014) ("the inclusion of an 'other insurance' clause in an otherwise primary policy will not convert a primary

United States District Court
Central District of California

policy into 'true' excess coverage").  The AIG Policy's "Other Insurance" term unambiguously stated several categories of other insurance carried by PWC Holding Corporation and LLCP was excess over its own coverage. Defendant's choice to characterize its own policy as exclusively primary is binding.  See Pub. Serv. Mut. Ins. Co., 205 F. Supp. 3d at 1170-71.

Plaintiff has also shown the Steadfast Policy issued to LLCP applied in excess to the AIG Policy as to coverage for the claims alleged against the Director Defendants in the Underlying Lawsuits.[8]  The Steadfast Policy expressly stated it operated in excess to insurance policies covering an "Insured Person" for his or her service in an "Outside Capacity."  (Pl. SUF No. 53.)  Pursuant to the definitions of those clear and unambiguous terms under the Steadfast Policy, the Director Defendants, although indisputably also executives and employees of LLCP, served on the Pacific World board of directors in an "Outside Capacity" and the AIG Policy covered their actions taken in that respect, thereby rendering the Steadfast Policy in excess to the AIG Policy as to those claims.  (See Pl. SUF Nos. 46-52; Def. SUF No. 21); see also Terrell, 40 Cal. App. 5th at 503.

Furthermore, Plaintiff has shown it is undisputed the XL Policy applied in excess to the Steadfast Policy.  (Pl. SUF Nos. 56-58; Def. SSUF No. 17.) Logically, as the Steadfast Policy was in excess to the AIG Policy, and the XL Policy was in excess to the Steadfast Policy, then it follows that the XL

---

[8] Plaintiff does not argue the Steadfast Policy was in excess to the AIG Policy in all respects, nor would the Court agree that it was.  LLCP and the LLCP Entities were also named in the Underlying Lawsuits and the Steadfast Policy provided primary coverage for the claims alleged against them.

49

Policy was in excess to the AIG Policy as to the claims alleged in the Underlying Lawsuits against the Director Defendants.

Defendant's argument that Plaintiff was primarily liable for insuring against the liability of the Director Defendants in the Underlying Lawsuits is not well-taken and is not supported by the evidence before the Court.  The Court agrees with Defendant that there is a general principle under California law that states if two insurance companies have independent obligations to provide insurance coverage for the same entities, then neither company's insurance policy can be primary.  See, e.g., Am. States Ins. Co., 202 Cal. App. 4th at 702-03; Carter, 52 Cal. App. 5th at 587-88; Maryland Cas. Co., 81 Cal. App. 4th at 1091.  That general principal does not apply here, however, as the AIG Policy was liable to provide primary coverage to the Director Defendants in their defense against, and settlement of, the Underlying Lawsuits.  The coverage under the Steadfast and XL Policies was for LLCP and the LLCP Entities and ran in excess to the AIG Policy as to the Underlying Lawsuits and the Director Defendants.

Accordingly, Plaintiff has shown the AIG Policy was the primary insurance policy covering the Director Defendants for the claims alleged against them in the Underlying Lawsuits.  Hence, Plaintiff meets its burden as to the second element of its subrogation claims.

### 3.     Subrogation Element 7: Whether Justice Requires Shifting the Loss from Plaintiff to Defendant

Next, the Court considers whether Plaintiff can meet its burden as to the seventh element of its subrogation claims.

United States District Court
Central District of California

"The seventh element asks whether justice requires that the claimed loss 'be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer.'" <u>Pulte Home Corp.</u>, 50 Cal. App. 5th at 235 (quoting <u>Interstate Fire & Cas. Ins. Co.</u>, 182 Cal. App. 4th at 33-34). "As courts have observed, 'there is no facile formula for determining superiority of equities, for there is no formula by which to determine the existence or nonexistence of an equity except to the extent that certain familiar fact combinations have been repeatedly adjudged to create an equity in the surety or the third party.'" <u>Id.</u> (citations omitted). Courts have considered the following factors to determine whether equity requires the shifting of the loss: (1) the cause of the loss; (2) the nature and scope of contractual promises; (3) the receipt of premiums; and (4) public policy. <u>See id.</u> at 236-239.

Plaintiff argues it is in a superior equitable position because Defendant breached the AIG Policy when it refused to pay the $1 million Side A coverage for the Director Defendants' costs to defend against and settle the Underlying Lawsuits. (<u>See</u> Reply at 11-12.)

In Opposition, Defendant argues each of these factors weigh in its favor, demonstrating its superior equitable position. In particular, Defendant argues Plaintiff has paid substantially less than Defendant to defend and settle the Underlying Lawsuits, as Defendant expended $10 million and Plaintiff has expended approximately $3.2 million. Defendant also contends Plaintiff insured many more parties to the Underlying Lawsuits than did Defendant, the XL Policy's $10 million limit was much higher than the $1 million Side A coverage under the AIG Policy, and Plaintiff received much

1   higher premiums than did Defendant.  (See Opp'n at 29-30.)  The Court

2   discusses these arguments as they relate to the foregoing four factors.

3       "The first factor asks, as between the parties to the subrogation

4   action, which has the greater causal connection to the loss."  Pulte Home

5   Corp., 50 Cal. App. 5th at 236.  As applied here, neither Defendant nor

6   Plaintiff had a causal connection to the ultimate loss suffered by Pacific

7   World and Prospect Capital as alleged in the Underlying Actions.  Neither

8   was a party in the Underlying Lawsuits and both have only provided

9   insurance coverage to the parties named in the Underlying Lawsuits.  In

10  other words, both parties were at least one step removed from the ultimate

11  loss alleged in the Underlying Lawsuits and they are equally removed from

12  the causal chain of events that gave rise to the Underlying Lawsuits.

13  Although Plaintiff stands in the shoes of the Director Defendants in this

14  subrogation action, the Court concludes this factor is neutral.

15      The second factor "compares the nature and scope of the relevant

16  contractual promises . . . , and as such, is similar to the second and third

17  elements [of a subrogation claim], which ask which party had contractual

18  liability of greater primacy."  Id. at 238.  As the Court has discussed at length

19  supra, the AIG Policy provided the primary insurance coverage for the

20  Director Defendants in the Underlying Lawsuits.  The Steadfast Policy

21  provided excess coverage to the AIG Policy as to those parties, and the XL

22  Policy provided excess coverage to the Steadfast Policy.  The AIG Policy,

23  thus, had "greater equitable responsibility" for providing the defense and

24  settlement costs for the Director Defendants, including the $1 million Side A

25

26

United States District Court
Central District of California

coverage.  Id.  "For purposes of comparing equities, this creates a liability of greater primacy for [Defendant]."  Id.

The third factor considers whether a party has received premiums as a basis to conclude, in a subrogation context, "that an insurer's receipt of premiums to insure the risk of loss would result in an unfair windfall to the insurance company if subrogation were permitted."  Id.  Although Defendant attempts to paint the premiums it received for the AIG Policy as substantially lower than those premiums received by Plaintiff for the XL Policy, this factor is neutral here because it is undisputed that both Plaintiff and Defendant received premiums for their respective insurance policies and "every insurer that pays a loss on behalf of its insured will have accepted premiums for the risk."  Interstate Fire & Cas. Ins. Co., 182 Cal. App. 4th at 45.

The fourth factor "asks whether public policy should play a role in the fairness analysis."  Pulte Home Corp., 50 Cal. App. 5th at 238.  In Interstate Fire & Cas. Ins. Co., 182 Cal. App. 4th at 47, the court weighed the public interest and concluded the following:

In our view, it is not a good idea to reward parties who refuse to fulfill their alleged indemnification obligations, particularly under the rubric that they are in as good or better an equitable position as the insurer that did fulfill its alleged indemnification obligation.  We believe it is more prudent to permit subrogation, so that a party with an alleged contractual indemnification obligation will be encouraged to step up in the underlying case and either fulfill the obligation (and implicitly help settle the case) or resolve any dispute over the application of the indemnification obligation.  If permitting subrogation to the insurer in

53

United States District Court
Central District of California

any way results in a windfall (because the insurer that accepted premiums to insure against the loss may now shift the loss to the other indemnitor), it would be better for the windfall to go to the one that undisputedly fulfilled its contractual obligations, rather than to the one that allegedly breached them.

Interstate Fire & Cas. Ins. Co., 182 Cal. App. 4th at 47.  Applying this reasoning here, the Court concludes public policy weighs in favor of shifting the $1 million loss from Plaintiff to Defendant.  Plaintiff fulfilled its contractual obligations pursuant to the XL Policy despite the XL Policy operating in excess to the Steadfast Policy, which operated in excess to the AIG Policy as applied to the defense and settlement costs incurred by the Director Defendants in the Underlying Lawsuits.  As discussed supra, Defendant breached its obligations to provide the Side A coverage after the $10 million D&O Coverage Section limit was exhausted.  Plaintiff will not enjoy a windfall here, but is simply seeking to recoup the $1 million (plus interest) it was forced to expend because Defendant (wrongfully) refused to pay the Side A coverage.  This factor weighs strongly in favor of shifting the $1 million loss to Defendant.

Having considered the four relevant factors, the Court finds two of the factors are neutral and two weigh, one strongly, in favor of shifting the $1 million loss to Defendant.  On balance, the factors weigh in favor of shifting the loss to Defendant.  Accordingly, Plaintiff has met its burden on element 7 of its subrogation claims.

### 4.      Conclusion

For the foregoing reasons, the Court concludes Plaintiff has met its burden on each element of its subrogation claims.  There is no genuine dispute of material fact that must be presented to a jury.  Accordingly, summary judgment in Plaintiff's favor is appropriate here and the Court GRANTS Plaintiff's Motion.

## B.      Defendant's Motion

Defendant moves the Court to enter summary judgment in its favor as to each of Plaintiff's claim.  Defendant argues Plaintiff cannot show it was not primarily liable for the $1 million it paid on behalf of its insureds and that Defendant was primarily liable.  Defendant also contends Plaintiff cannot show that "justice requires" that the entire $1 million should be shifted to Defendant.  These are the same arguments Defendant raised in opposition to Plaintiff's Motion.

In Opposition, Plaintiff contends it has established all the elements of its subrogation claim, Plaintiff was not primarily liable for the claimed loss, and Defendant breached the AIG Policy when it refused to pay the $1 million Side A coverage for the Underlying Lawsuits.  Plaintiff also argues "justice requires" that the $1 million loss be shifted from Plaintiff to Defendant because Defendant's "equitable position is inferior" to Plaintiff's.  These are identical arguments to those raised in Plaintiff's Motion.

Although the Court must consider each cross motion for summary judgment on its own merits and separately, Riverside Two, 249 F.3d at 1136, the Court has already addressed each of these arguments in ruling on

Plaintiff's Motion, supra.  The evidence presented in support of, and in opposition to, Defendant's Motion is the same as that presented with respect to Plaintiff's Motion.  As no new arguments or evidence have been raised in support of, or in opposition to, Defendant's Motion that the Court did not already consider above, the Court DENIES Defendant's Motion for the same reasons that it rejected Defendant's arguments that Plaintiff had failed to prove each element of its subrogation claims.

## VI.    CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendant's Motion for Summary Judgment.

The Court enters judgment in favor of Plaintiff and against Defendant on Plaintiff's contractual and equitable subrogation claims.  The Court shifts the $1 million loss incurred by Plaintiff to Defendant.  A separate Judgment will issue, setting forth Defendant's liability for $1 million, plus pre-judgment interest, to Plaintiff.

**IT IS SO ORDERED.**

Dated:    7/13/21

Virginia A. Phillips
United States District Judge

United States District Court
Central District of California